## MATHEWSON *v.* PHŒNIX IRON FOUNDRY.

*(Circuit Court, D. Rhode Island. May 20, 1884.)*

1. WRITTEN CONTRACT OF MARRIAGE—VALIDITY.
   A written contract of marriage, although not provided for by statute, is a good contract of marriage, *per verba de præsenti.*

2. MARRIAGE A CIVIL CONTRACT—CONSENT.
   Marriage is a civil contract, the essence of which is consent.

3. MARRIAGE AT COMMON LAW—CONSENT.
   At common law, persons of suitable age might, by words of consent, contract a valid marriage without the presence and intervention of a minister, and without any particular form of solemnization.

4. SAME—EFFECT OF DIRECTORY STATUTE REGULATING MARRIAGE.
   Where a state statute regulating marriage is directory merely, and does not forbid other marriage contracts, a marriage valid at common law is good in that state.

5. CHAPTER 134, REV. ST. 1857, R. I., DIRECTORY.
   Chapter 134, Rev. St. 1857, of Rhode Island, relating to marriages, is directory merely.

6. COMMON LAW IN RHODE ISLAND.
   The common law has always existed in Rhode Island, except so far as modified or changed by statute.

7. REPEAL OF STATUTE—REVIVOR OF COMMON LAW.
   Where the legislature of a state does away entirely with the common law by passing statutes, but afterwards repeal those statutes, upon their repeal the common law revives.

8. COMMON-LAW MARRIAGE—VALIDITY IN UNITED STATES.
   Marriages at common law are not partial in the United States, in the sense that the contract must be completed *in facie ecclesiæ,* but they are valid without the presence or intervention of a person "in holy orders."

9. SAME—VALIDITY—DOWER—UNLAWFUL RELATIONS OF PARTIES.
   A written contract of marriage entered into between two parties in the presence of witnesses constitutes a valid marriage, and confers upon the wife the right to dower; the fact that the previous relations of the parties were unlawful is immaterial.

10. SAME—EFFECT OF DENIAL.
    A denial by a party to a marriage *per verba de præsenti* does not annul the contract.

11. LAND COVERED BY TIDE-WATER—DOWER IN.
    Where a husband deeds land partially covered by tide-water, his wife is entitled to dower in the part not so covered.

In Equity.

*Benj. F. Butler, E. M. Johnson,* and *E. S. Hopkins,* for complainant.

*Brown & Van Slyck* and *Jas. Tillinghast,* for defendant.

Heard before LOWELL and COLT, JJ.

COLT, J. In this suit the complainant claims dower in certain land as the widow of Henry C. Mathewson, through whom the defendant derived title. As evidence of marriage she produces the following paper:

"PROVIDENCE, R. I., August 18, 1859.

"This is to certify that we, H. C. Mathewson and Sarah D. Mathewson, both of Providence, R. I., do hereby acknowledge ourselves before the following witnesses to be man and wife. H. C. MATHEWSON.

"SARAH D. MATHEWSON.

"Signed in the presence of

"C. A. CARPENTER.

"S. J. HORTON."

The witness Horton was a clergyman, then residing in Connecticut. Another person, named Connell, swears he was also present when the paper was signed. The defendant denies the legality of the marriage.

The statutes of Rhode Island, in force at this time, contain certain provisions regulating the subject of marriage. Rev. St. 1857, c. 134. By section 7, any minister or elder domiciled in the state, or either justice of the supreme court, may join persons in marriage. Section 9 prohibits any minister, elder, or magistrate from joining in marriage any person, unless they shall sign and deliver to such minister, elder, or magistrate a certificate setting forth their names, age, color, occupation, etc. By section 11 a penalty is imposed upon the minister, elder, or magistrate who shall join persons in marriage without first receiving such certificate. By section 14 the solemnization of marriage is required to be in the presence of two witnesses, at least, besides the minister, elder, or magistrate officiating. Section 15 permits Quakers, Friends, and Jews to marry according to their forms and ceremonies. Section 16 requires the parties to any marriage, before celebration, to deliver to the town clerk the certificate mentioned in section 9, under penalty of fine or imprisonment.

It is clear that the complainant was not married in the mode laid down by statute. The minister present was not domiciled in the state. It does not appear that he officiated at the marriage. He only testifies that he signed the paper, and that those whose signatures appear, signed it. The parties gave no certificate, as required by statute. But while this marriage was not according to the form of the statute, it was a good contract of marriage, *per verba de præsenti,* or at common law, so called. Marriage has long since been regarded as a civil contract, the essence of which is consent. *Nuptias non concubitus, sed consensus facit.* This, says Chancellor KENT, is

the language equally of the common and canon law, and of common reason. 2 Kent, Comm. 51.

At common law, as held in this country, and until recently, it would seem, as generally understood in England, persons of suitable age might, by words of present consent, contract a valid marriage without the presence and intervention of a minister, and without any particular form of solemnization. A statute may, of course, take away this common-law right; but this is not to be presumed. The right is not conferred by statute, but exists independent of it, and therefore it is held the rule does not apply that when a statute directs a thing to be done in a particular way, it is void if done in any other way. The construction usually adopted is that when the statute regulating marriage is directory merely, when it does not expressly forbid other marriage contracts, a marriage *per verba de præsenti*, or at common law, is good.

It will be observed that the Rhode Island statute is directory in form. It contains no words making marriage a nullity unless the statutory form is complied with. It nowhere declares that marriages good at common law shall be void. On the contrary, section 13 says: "Whoever shall be married without duly proceeding as by this chapter is required, shall be fined not exceeding fifty dollars;" which implies that marriage may be contracted independent of the statutory form, and that such marriage is not invalid, but that the parties so married shall be liable to a penalty. This provision is in marked contrast with the earlier sections of the chapter, where the statute expressly makes marriages within the prohibited degrees of affinity or consanguinity, and in some other cases, absolutely null and void.

We think a careful reading of the whole statute impresses the mind with the conviction that while the legislature intended to subject to punishment the parties, as well as those officiating, who might fail to observe the statutory provisions, it was not the intention to make marriages void by reason of non-compliance, and thus subject parties to all the serious consequences which would flow from such a result.

Undoubtedly the legislature could prohibit the exercise of the right of marriage except in the way prescribed by statute. But the question here is, what is the proper rule of interpretation under a statute like that of Rhode Island?

Judge STRONG, in construing a statute of similar character, and speaking for the supreme court of the United States, says:

"No doubt a statute may take away a common-law right; but there is always a presumption that the legislature has no such intention unless it be plainly expressed. A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of bans, or be attested by witnesses. Such formal provisions may be construed as merely directory, instead of being treated as de-

structive of a common-law right to form the marriage relation by words of present assent. And such, we think, has been the rule generally adopted in construing statutes regulating marriage. Whatever directions they may give respecting its formation or solemnization, courts have usually held a marriage good at common law to be good notwithstanding the statutes, unless they contain express words of nullity." *Meister* v. *Moore*, 96 U. S. 76, 79. And see the remarks of GRIER, J., in *Hallett* v. *Collins*, 10 How. 174, 181.

The weight of authority seems largely to sustain this view. 1 Bish. Mar. & Div. § 283; 2 Greenl. Ev. § 460; 2 Kent, Comm. 51; Reeve, Dom. Rel. 307; *Hutchins* v. *Kimmell*, 31 Mich. 126, 130; *Pearson* v. *Howey*, 6 Halst. 12; *Hantz* v. *Sealy*, 6 Bin. 405; *Com.* v. *Stump*, 53 Pa. St. 132; *Fenton* v. *Reed*, 4 Johns. 52; *Jackson* v. *Winne*, 7 Wend. 47; *Rose* v. *Clark*, 8 Paige, 574; *Starr* v. *Peck*, 1 Hill, 270; *Clayton* v. *Wardell*, 4 N. Y. 230; *Cheney* v. *Arnold*, 15 N. Y. 345; *O'Gara* v. *Eisenlohr*, 38 N. Y. 296; *Duncan* v. *Duncan*, 10 Ohio St. 181; *Carmichael* v. *State*, 12 Ohio St. 553; *Graham* v. *Bennet*, 2 Cal. 503; *Estate of McCausland*, 52 Cal. 568; *Dumaresly* v. *Fishly*, 3 A. K. Marsh. 368; *Donnelly* v. *Donnelly's Heirs*, 8 B. Mon. 113; *Londonderry* v. *Chester*, 2 N. H. 268; *Newbury* v. *Brunswick*, 2 Vt. 151. But see *Northfield* v. *Plymouth*, 20 Vt. 582; *State* v. *Murphy*, 6 Ala. 765; *Potier* v. *Barclay*, 15 Ala. 439; *Yates* v. *Houston*, 3 Tex. 433; *Patton* v. *Philadelphia*, 1 La. Ann. 98; *Holmes* v. *Holmes*, 6 La. 463; *Cargile* v. *Wood*, 63 Mo. 501; *Dyer* v. *Brannock*, 66 Mo. 391.

In a few states it must be admitted the rule is different. *Milford* v. *Worcester*, 7 Mass. 48; *Com.* v. *Munson*, 127 Mass. 459; *Denison* v. *Denison*, 35 Md. 361; *Cram* v. *Burnham*, 5 Greenl. 213; *Ligonia* v. *Buxton*, 2 Greenl. 102; *State* v. *Samuel*, 2 Dev. & B. Law, 177, 180; *Bob* v. *State*, 2 Yerg. 177; *Grisham* v. *State*, Id. 589; *Dunbarton* v. *Franklin*, 19 N. H. 257.

But it is said that common-law marriages were never considered valid in Rhode Island. The question has not been passed upon by the state court. The argument is based upon the history of legislation upon the subject, and especially upon the older statutes. The earliest statute relating to marriage was passed at the first session of the general assembly ever held in Rhode Island, in 1647, and it provided that no other marriages should be held lawful except those contracted according to the form of the statute. The act declares:

"No contract or agreement between a man and a woman to owne each other as man and wife shall be owned from henceforth threwout the whole colonie as a lawful marriage, nor the children or issue so coming together to be legitimate or lawfullie begotten, but such as are in the first place with the parents, then orderly published in two severall meetings of the townsmen, and lastly confirmed before the head officer of the town, and entered into the towne clerk's booke."

Then follows a penalty against those going contrary to the "present ordinance." 1 Col. Rec. 187.

By act of March 17, 1656, parties were required to publish their intention of marriage, and objection to such marriage might be heard

before two magistrates, when, if disallowed, it was referred to the "general court of tryalls." Id. 330.

The act of May 3, 1665, after condemning the loose observance of the statute of 1647, orders that act and subsequent acts to be punctually observed, and inflicts an additional penalty of fornication on persons who should presume to marry otherwise, or live together as man and wife. The act then proceeds expressly to validate the relations of all such then living within the colony "that are reputed to live together as man and wife by the common observation or account of their neighborhood." 2 Col. Rec. 104.

By the act of 1701 it was ordered that all marriages take place after due publication of intentions, etc., and a fine was imposed on officers presuming to join persons in marriage without such publication, excepting those married according to the laws, customs, and ceremonies of the church of England, and Quakers. The exception was afterwards extended to Jews. This act was entitled "An act for preventing clandestine marriages," and this same title we find in the several subsequent revisions of the statutes until the revision of 1857. 3 Col. Rec. 435; Pub. Laws 1663–1745, p. 30; Digest of 1767, pp. 172–175.

By act of December, 1733, settled ministers and elders of every denomination were authorized to join persons in marriage after due publication, and upon receiving certificate. They were required to keep and return to the town clerk a record thereof for registry, and a fine was imposed upon them for marrying without publication. 4 Col. Rec. p. 490; Pub. Laws 1663–1745, p. 176.

It is claimed that these enactments are controlling, and that they show that common-law marriages were never recognized in Rhode Island. The common law has always existed in Rhode Island, except so far as modified or changed by statute. This is true of marriage, as well as other subjects. The legislature may have seen fit in early times to do away entirely with the common law, and to make marriage illegal unless it conformed to the statutory regulations. But if the legislature had at any time repealed all statutes on the subjects, the common law would have been revived. And, in so far as the legislature has seen fit to change the statute, to make it less restrictive by not declaring all other marriages illegal, as in the earliest enactments, in so far it has restored the common-law right. If, upon a proper construction of the statute in force, we find the common-law right is not denied, then it still exists, though it may not have existed under former and different statutes. Unless the statute under consideration, upon a proper construction, prohibits marriages *per verba de præsenti*, we do not think we should, by implication derived from old statutes, decide against their validity. To make marriages void and children illegitimate, by implication, is a serious thing. Because, under earlier statutes, a marriage, not made in conformity therewith, may have been invalid, we do not feel war-

ranted in implying that such is the proper interpretation of the stat-
ute of 1857. We think it safer to hold that in modifying the terms
of the statute the legislature intended to modify the law; and, as we
have before said, our conclusion is that the statute of 1857 does not
make a marriage *per verba de præsenti*, or at common law, void; this
being the construction put upon similar statutes in most of the states,
and in the supreme court of the United States.

But it is contended that marriage *per verba de præsenti* was not a
full marriage at common law, that it was only a partial marriage,
where either party could compel the other to go before the ecclesias-
tical court and complete the contract *in facie ecclesiæ*. Whatever
view may now be taken in England since the case of *The Queen* v.
*Millis*, decided in 1844, (10 Clark & F. 534,) where the house of lords,
upon appeal, were evenly divided on the question, the adjudications
in this country from the earliest times have established the full valid-
ity of marriages at common law. This is the view taken by the su-
preme court in *Meister* v. *Moore*, and by Chancellor KENT, Judge
REEVE, Professor GREENLEAF, Judge COOLEY, and Mr. BISHOP. See
authorities before cited. Partial marriages have never been recog-
nized in this country. We have no established church, and no ec-
clesiastical court to which application can be made to complete the
contract. Our situation and circumstances would necessarily bring
about a modification of the common law as recently expounded by
English courts.

The proposition that the presence and intervention of a person "in
holy orders" is requisite to a valid marriage at common law in this
country, is contrary to the opinion of our ablest jurists, and to a long
line of adjudications. It would indeed have seemed strange to our
Puritan forefathers, if, in order to contract a legal marriage, they had
been obliged to bring with them a clergyman of the church of Eng-
land or of Rome to be present at the ceremony. Bish. Mar. & Div.
§ 282.

If marriage at common law in this country, by words of present
consent, is valid and complete, then clearly the widow should be en-
titled to dower. Scribner on Dower, says, (vol. 1, p. 107:)

"Under our system of laws it is a solecism in language to speak of a mar-
riage as good for some purposes and not good for all,—as a marriage which is
not a marriage. And it may be safely said that in those states where the
courts already have, or hereafter shall determine, in favor of the validity of
private marriages, such marriages will be regarded as being attended with all
the civil rights and obligations which, under the ecclesiastical law, flow from
a marriage duly solemnized *in facie ecclesiæ*, and therefore that they confer
upon the wife the right to dower."

If the written contract entered into between these parties in the
presence of witnesses—one of whom was a clergyman—constitutes,
as we hold it does, a valid marriage *per verba de præsenti*, it can make
no difference if their previous relations were unlawful; nor would the

fact that either party afterwards denied the marriage be sufficient to annul the contract.

The defendant derived title from Henry C. Mathewson. The evidence goes to prove that a large part of the land, at the time it was deeded, was covered by tide-water, and therefore it is claimed the title was in the state, (*B iiley* v. *Burges,* 11 R. I. 330;) but this would not apply to the remaining portion, in which we hold the complainant entitled to dower as the lawful widow of Henry C. M ithewson. Rev. St. R. I. 1857, *c.* 202, § 1.