## Gay, et al. v. Brent.

(Decided November 23, 1915.)

## Appeal from Clark Circuit Court.

1. **Contracts—Restraint of Trade—Common Law Rule—Monopolies.** —If a contract is made that suppresses competition and controls the market, and that contract is entered into between those who have theretofore engaged in competition in the market sought to be controlled, it is a contract in restraint of trade according to the common law in force in this State.

2. **Monopolies—Trusts—Pools.**—The act of 1890, now sections 3915-3921, of the Kentucky Statutes, prohibiting the formation of trusts, pools and monopolies for the purpose of regulating, controlling or fixing the price of an article, is in full force and effect in this State.

3. **Monopolies—Trusts—Pools—Restraint of Trade.**—Sections 3915-3921, of the Kentucky Statutes, prohibiting trusts, pools and monopolies, and the common law doctrine of restraint of trade, are not in conflict, and whichever is the most available may be invoked for the purpose of staying the unlawful activities of any trust, pool or monopoly entered into for the purpose of controlling the market or regulating or fixing the price of property.

4. **Constitutional Law—Section 198 of the Constitution—Statutes.**— Sections 3915-3921 of the Kentucky Statutes are not in conflict with section 198 of the State Constitution.

5. **Constitutional Law—Section 198 of the Constitution.**—Section 198 of the State Constitution is not self-executing. It is merely a direction to the legislative department of the State to enact such laws as may be necessary to prevent the conditions described in the section.

6. **Constitutional Law—Statutes—Invalidity of.**—The acts of 1906, 1908 and 1910, now sections 3941a-3941d, of the Kentucky Statutes, are unconstitutional and void.

7. **Statutes—Effect of Uncertainty in.**—A statute that makes the test of liability in a criminal case or the enforcement of a right growing out of a contract in a civil case depend on the question whether the price of an article has been enhanced above its real value or decreased below its real value, is void for uncertainty both in respect to criminal matters as well as civil rights and liabilities.

8. **Statutes—Uncertainty or Indefiniteness in—Effect.**—Although a statute may be so uncertain or indefinite as to prevent the enforcement of civil rights and liabilities arising thereunder, this will not affect the enforcement of these rights if they may be rested on common law rules.

9. **Statutes—Effect of Unconstitutional Amendment.**—The validity of a constitutional act cannot be impaired or affected by an unconstitutional amendment. The amendment may be held invalid but

the act it amends, if free from constitutional objection, will stand as it did before the amendment.

10. Overruled Cases.—The case of the Com. v. International Harvester Co., 131 Ky., 551, is overruled.

SHELBY, NORTHCUTT & SHELBY, TALBOTT & WHITLEY, E. S. JOUETT, B. R. JOUETT and J. M. STEVENSON for appellants.

PENDLETON, BUSH & BUSH, HARMON STITT and REUBEN HUTCHCRAFT for appellee.

OPINION OF THE COURT BY JUDGE CARROLL.—Affirming.

Briefly, the facts of this case are these: Previous to 1906, David S. Gay, J. S. Wilson, E. F. Spears & Son, and N. Ford Brent were dealers in Kentucky bluegrass seed, each of them doing business in competition with and independent of the others. About 90% of the bluegrass seed of the world is produced in Kentucky, and in the years previous to 1906, clean bluegrass seed had been selling at from 80 cents to $1.35 a bushel, the usual price being $1.25 a bushel. In June, 1906, Gay, Wilson, and Spears & Son conceived the purpose of securing control of the bluegrass seed market, and in execution of this plan they entered into a private, written contract, which is set out in full in the opinion written in this case when it was here before and that may be found in 149 Ky., 615, 41 L. R. A. (N. S.), 1034.

After this agreement was entered into, and pursuant to its terms, and to accomplish the intended object, the parties to the agreement at once commenced to buy all of the bluegrass seed available, their purchases including the seed owned by farmers as well as dealers. Among the purchases of seed so made was a large quantity bought from Brent at $1.30 per bushel. When the time arrived for the delivery of this seed by Brent he refused to perform the contract, and thereupon Gay, Wilson and Spears & Son, who were doing business under the name of the Kentucky Blue Grass Seed Company, brought suit against Brent to recover damages for a breach of the contract, alleging in the petition that between the time the contract was entered into and the time specified for the delivery of the seed, it had advanced 38 cents per bushel, and had he performed his contract they would have realized a profit of this sum.

In the answer to this petition, which is set out at length in the former opinion, Brent charged that the

purpose of the agreement between Gay, Wilson and Spears & Son, of which agreement he was ignorant when he contracted to deliver the seed, was to control the bluegrass seed market and create a monopoly in unreasonable and unlawful restraint of trade, and to thereby increase the cost of bluegrass seed to the public. He further averred that in entering into this agreement Gay, Wilson, and Spears & Son intended to and did form and create a trust, combine and pool in violation of the statute law of the State for the purpose of enhancing the price of bluegrass seed above its real value, and that immediately after one object of the pool had been accomplished in practically securing control of the bluegrass market, they did arbitrarily raise the price of bluegrass seed above its real value.

To this answer a general demurrer was sustained, and from the judgment of the lower court holding that his answer did not present a defense, Brent prosecuted an appeal to this court.

In the course of the opinion of this court holding that the answer presented a good defense on which Brent was entitled to go to trial, it was said: "Nor do we find it necessary in disposing of the case to consider at all the anti-trust statutes of the State. Leaving out of view entirely the applicability of the anti-trust statutes, we think the controlling and decisive question in the case is—did the averments of the answer, which must be treated as true, state the defense of an unlawful and unreasonable restraint of trade upon which Brent was entitled to introduce evidence and have a decision on the merits? * * * It will also be noticed that the answer in substance charged that the partnership or agreement entered into between Gay and his associates had for its purpose the creation of a trust and monopoly to control the bluegrass seed market of the country, and to fix and regulate the price at which the seed should be sold; and that in pursuance of this purpose and to carry it into effect the purchase of the carload of seed from Brent was one of many purchases undertaken in execution of the plan to control and monopolize the market and fix and regulate the price of the seed."

In answer to the argument that the purchase of the seed from Brent involved only a small part of the bluegrass seed then on the market, and, therefore, it should

not be treated as an illegal arrangement or as an unreasonable or unlawful agreement in restraint of trade, the court said, quoting with approval from the opinion in Merchants' Ice & Cold Storage Co. v. Rohrman, 138 Ky., 530, 30 L. R. A. (N. S.), 973, and applying it to the facts of the Brent case:

"But the validity of this particular contract cannot be determined by looking at it alone. It must be considered in connection with the others of which it was and is a part, and when so considered in connection with the circumstances under which it was entered into and the conditions that gave rise to its execution, we find that it was only one of a number of like contracts secured about the same time by the Merchants' Refrigerating Company in furtherance of the purpose to obtain control of the ice market and effectually destroy substantial competition. In short, we think it is plain that the purpose in the minds of the parties to this transaction was to purchase the National Ice & Cold Storage Company and Rohrman's interest therein as a link in the chain that would, finally, bind all the consumers of ice in Louisville to the wheels of a single concern, thereby creating a condition that would enable the purchaser to control the market and stifle, if not suppress, competition. * * * If a contract is made that suppresses competition, and controls the market, and that contract is entered into between those who have heretofore engaged in competition in the market sought to be controlled, it is a contract in restraint of trade. It may be more. It may amount to a trust or conspiracy or a monopoly, but it is, nevertheless, a contract in restraint of trade. To restrain trade is the essential feature of the contract—the reason why it was made. * * * If trade that is in competition could not be restrained, the promoters would not go into the scheme; and when such a contract is made, whatever form it may assume, or by whatever name it may be called, and although it may be reached under the law of monopolies, trusts, and conspiracies, it will be declared void as being in unreasonable restraint of trade."

It was further said in the opinion: "Nor do we think that in ruling that the scheme of Gay and Company was an agreement in restraint of trade, we have unduly extended the scope of the principle upon which the doctrine rests. It is true that by the common law con-

tracts treated as being in restraint of trade were limited to contracts having for their purpose the purchase of some trade or business, as a part of which the seller agreed not to engage in the trade or business he had disposed of. But, in dealing with conditions brought about by modern business methods, it has been found necessary for the public good to extend the common law prohibition against contracts in restraint of trade to states of case involving more than the mere purchasing and selling of a trade or business, so as to give the courts for the good of the public authority to prevent as much as possible combinations and arrangements having for their purpose the creation of a monopoly, the control of prices, and the suppression of competition. Addison Pipe & Steel Co. v. United States, 175 U. S., 211, 44 L. Ed., 136.

"The restraint of trade may be accomplished in more than one way. Every business scheme that has for its purpose the control of the market and the fixing of prices, necessarily tends to restrain trade and suppress competition in the article sought to be controlled. But when the doctrine was first recognized conditions were such that the public good only required that it be applied to contracts of sale and between the parties to the contract. It is, however, manifest that if this wholesome principle of the common law should be confined to the narrow limits that were sufficient in its origin, it would be wholly inadequate to correct the evils that modern trade conditions have produced. And so, taking for a foundation the principle that illegal and unreasonable restraint of trade is obnoxious to the spirit of the law, the range of this principle will be extended to meet the requirements of today and to embrace every condition in which an unlawful attempt is made to restrain trade and control the market and suppress competition by whatever means these ends are sought to be accomplished."

On the trial of the case, after it was remanded, the law and facts, by agreement, were submitted to the trial court, and in a judgment and an opinion holding that Gay, Wilson, and Spears & Son could not maintain the action, the trial court said, in his findings of law, that "The Kentucky Statutes against pools, trusts and conspiracies do not apply to contracts in restraint of trade. Contracts in restraint of trade are controlled by the

common law, and when they are unreasonable, they are declared to be void. A contract entered into between those who have theretofore engaged in competition with reference to any particular product or commodity, which suppresses competition and controls the market with reference to that product or commodity, is in unreasonable restraint of trade; and this suppression is not required to be total in order to bring it within the condemnation of the law. When the enforcement of an executory contract would be a step in the perfection of a scheme to restrain trade in a product or commodity, the law will not aid the perfection of such a scheme by enforcing such an executory contract.''

In his findings of fact the court said: "It was not the purpose of the plaintiffs in entering into the written agreement of June 1, 1906, to fix the price of bluegrass seed above its real value. The purpose of the parties in entering into that agreement was to establish a stable market for bluegrass seed, and thereby enable the producers to realize a fair and reasonable price for it. The effect of that agreement and what was done under it by the plaintiffs was to substantially suppress competition in the purchase of bluegrass seed. The purchase of the carload of seed from defendant was a part of a scheme of plaintiffs to control the bluegrass seed market and make effective the agreement of June 1, 1906. It follows from these views and these findings of law and fact that the defense of unreasonable restraint of trade has been sustained by the defendant, and it is, therefore, adjudged that the petition be dismissed.''

From that judgment this appeal is prosecuted.

In the argument on this appeal counsel for appellants do not contend that the purpose of the agreement between Gay, Wilson and Spears & Son was not to secure control of the bluegrass seed market and thereby suppress competition. They rest their claim for reversal on the ground that the common law doctrine invalidating executory contracts in restraint of trade, has been abrogated by the Constitution and statutes of this State, and, therefore, assuming the correctness of the finding of the trial court, that "it was not the purpose of the plaintiffs in entering into the written agreement of June 1, 1906, to fix the price of bluegrass seed above its real value,'' but only to "establish a stable market for bluegrass seed, and thereby enable the producers to

realize a fair and reasonable price for it," they insist that the judgment should be reversed, with directions to enter a judgment in favor of Gay, Wilson and Spears & Son for the amount of damages they sustained by reason of the breach of contract.

We do not find ourselves quite able to agree with the finding of the lower court that the purpose of the agreement was not to enhance the price of bluegrass seed above its real value; but not regarding this question as a material one in the disposition of the case, we will not extend the opinion in stating the reasons why we have reached, on this issue of fact, a different conclusion from that arrived at by the lower court. For entertaining the view that the contract between Brent and Gay, Wilson and Spears & Son was in restraint of trade we will at once go to a consideration of the main question, which is whether the common law doctrine of restraint of trade, as set forth in the opinion from which we have quoted, is yet in force in this State and available as a defense in the attempted enforcement of an executory contract, when the facts show that the parties seeking enforcement of the contract are doing so with the purpose of securing a monopoly in a commodity by controlling the market and suppressing competition in the article that is the subject matter of the executory contract.

An understanding and disposition of this question makes it necessary that we should set forth at some length the state of the Constitution and statutory law in this State on the subject of pools, trusts and monopolies, and the construction that has been put on these laws by this court as well as by the Supreme Court of the United States.

The first statute enacted by the Legislature of this State prohibiting the formation of trusts, pools and monopolies for the purpose of regulating, controlling, or fixing the price of an article became a law in 1890, and may be found in sections 3915-3921, inc., of the Kentucky Statutes. The substance of this act was that it should be unlawful for any corporation, partnership, association or person to become a member of or in any way interested in any pool, trust, combine, agreement or confederation with any other corporation, partnership, association or person for the purpose of regulating, controlling or fixing the price of any merchandise,

manufactured article or property. Another provision
fixed a penalty for a violation of this statute. Another
made any contract or agreement violating its provisions
void; and there was a further provision that the pur-
chasers of any property or article from a corporation,
partnership or persons transacting business contrary
to the provisions of the act should not be liable for the
price of or payment for such article or property.

It will be observed that the illegality of the transac-
tions prohibited by the statute did not depend on the
fact that the purpose of the combination was to enhance
the price of an article above its real value, or depreciate
its value below its real value. It was made unlawful to
enter into or become a party to any agreement or ar-
rangement "for the purpose of regulating or controlling
or fixing the price of any merchandise, manufactured
article or property of any kind" without regard to
whether the price of the article, merchandise or prop-
erty was enhanced or diminished. This statute stood
until 1906 as the only declaration of the Legislature of
the State dealing or attempting to deal with the subject
set forth in the statute.

However, in the new Constitution of the State,
adopted in 1891, it was provided, in section 198, that
"it shall be the duty of the General Assembly, from
time to time, as necessity may require, to enact such
laws as may be necessary to prevent all trusts, pools,
combinations or other organizations, from combining to
depreciate below its real value any article, or to enhance
the cost of any article above its real value."

Subsequent to the adoption of this constitutional pro-
vision, and in 1900, there came to this court the case
of the Commonwealth v. Grinstead, 108 Ky., 59. In
that case Grinstead and Tinsley were indicted for a
violation of the act of 1890, and in this court the chief
contention of the defendants was that the act of 1890
was repealed by the new Constitution of 1891, because
inconsistent with it, and was furthermore no longer the
law, because in conflict with section 198 of the Consti-
tution. But the court, in a very full opinion, rejected
these arguments and held that the act of 1890 remained
in full force, unaffected by the new Constitution or sec-
tion 198 thereof. And in Com. v. Bavarian Brewing
Co., 112 Ky., 925, the question was again before the
court, and the ruling in the Grinstead & Tinsley case was

adhered to. So that it has been definitely and correctly determined by this court that the present Constitution does not affect in any manner the validity of the act of 1890.

Coming now to the effect on the act of 1890 of the legislation subsequent to the adoption of the present Constitution, we find that in 1906 the first act under the new Constitution on the subject of pools and combinations was enacted. This section is now section 3941a of the Kentucky Statutes, and it provides, in substance, that it should be lawful for any number of persons to combine, unite or pool crops of wheat, tobacco and other farm products raised by them for the purpose of classifying, growing, holding or disposing of the same in order to obtain a higher price than they could obtain by selling these crops separately; and that contracts entered into for the purpose of carrying out the objects of the act should be lawful, and that suits might be maintained for any breach of these contracts. In 1908 and 1910 other acts were passed the purpose of which was to strengthen and make more effective the act of 1906, and these acts made it an offense, by fine and imprisonment, for any person to sell or solicit or buy any pooled property which had been listed of record as provided in the acts.

After the act of 1906 was passed, and in 1909, there came to this court the case of the Com. v. International Harvester Co., 131 Ky., 551, and the question presented was the sufficiency of an indictment against the Harvester Company charging it with a violation of the act of 1890. The contention of the Harvester Company was that as the act of 1906 allowed farmers to do as legal the things that were charged as illegal against it, the act of 1890 must fall because in conflict with the Fourteenth Amendment to the Constitution of the United States forbidding legislation that denied the equal protection of the law to all persons, and, therefore, it could not be indicted for a violation of the act of 1890.

The lower court sustained this contention and dismissed the indictment, but in reviewing the judgment this court said that the act of 1890 and the act of 1906 should be construed together as one act and made to conform to section 198 of the Constitution. It was also held that the act of 1906, although by its terms limited to farmers and growers of crops, operated, when read

in connection with the act of 1890, to confer upon all persons the same benefits and privileges extended to farmers. So reading the act of 1890 and the act of 1906 as one act, in connection with section 198 of the Constitution, it was further held to be essential to a prosecucution against any corporation, partnership, association or person for entering into a pool, trust or combination for the purpose of regulating, controlling or fixing the price of any article, to charge in the indictment and show by evidence that the purpose or effect of the trust, pool or combination was to depreciate the cost of the article below its real value or to enhance the cost of the article above its real value, as this was the test of illegality fixed by the Constitution and by the act of 1906, when properly read and construed.

In short, the ruling of the court in this case was that no pool, trust or combination created or entered into for the purpose of fixing the price of any article was unlawful unless the purpose or effect of the pool, trust or combination was to increase the price of the article above or decrease it below its real value.

In the later case of International Harvester Co. v. Com., 137 Ky., 668, the indictment was for a violation of the act of 1890, and following the ruling in the previous International Harvester case, it was held to be necessary to a conviction to show that the purpose of the pool or combination was to increase or depreciate the price of an article above or below its real value, although the indictment might have been found under the act of 1890. In International Harvester Co. v. Com., 144 Ky., 403; International Harvester Co. v. Com., 147 Ky., 564; International Harvester Co. v. Com., 147 Ky., 795; International Harvester Co. v. Com., 149 Ky., 41, and perhaps other cases, the law as laid down in the first case in 131 Ky. was followed.

Collins v. Com., 141 Ky., 564, was an indictment against Collins for selling a crop of pooled tobacco in violation of the acts of 1908 and 1910, now section 3941c of the Kentucky Statutes. In that case on the authority of the rule announced in the International Harvester cases, the validity of the statute imposing a penalty for selling pooled tobacco was recognized, and the judgment against Collins imposing the penalty provided by the statute was affirmed.

On an appeal by the International Harvester Co. to the Supreme Court of the United States from the judgments of this court affirming judgments against it in the cases mentioned, the Supreme Court, in 234 U. S., 216, in an opinion reversing the opinion of this court, after saying that "when the Court of Appeals came to deal with the act of 1890, the Constitution of 1891, and the act of 1906, it reached the conclusion, which now may be regarded as the established construction of the three taken together, that by inter-action and to avoid questions of constitutionality, they were to be taken to make any combination for the purpose of controlling prices lawful unless for the purpose or with the effect of fixing a price that was greater or less than the real value of the article," came to the conclusion that these acts and the section of the Constitution so construed were opposed to the Fourteenth Amendment of the Constitution of the United States, because it was not possible under these statutory and constitutional provisions so construed for any person to determine with reasonable certainty when the price of an article had been enhanced above or depreciated below its real value.

In the case of Collins v. Commonwealth, also appealed from this court, the Supreme Court of the United States, in an opinion that may be found in 234 U. S., 634, reversed the judgment of this court and held that the prosecution against Collins for selling pooled tobacco could not be sustained because the acts of 1908-10 as construed by this court in the 131 Ky. case were by reason of their uncertainty in making the guilt of Collins depend on whether the purpose of the pool, of which he was a party, was to enhance or decrease the price of the pooled property above its real value fundamentally defective.

As the law announced by the Supreme Court of the United States in these opinions is, of course, conclusive and binding upon this court, as much so as the law announced by this court is conclusive and binding upon the circuit courts and inferior courts of this State, the question arises, what is the effect to be given to the Supreme Court decisions in their operation upon the act of 1890, section 198 of the Constitution, the acts of 1906, 1908 and 1910, and the opinions of this court in the International Harvester cases construing these statutory and constitutional provisions?

Taking up first the act of 1890, we think it may be confidently asserted that this act is not open to any constitutional objection on the ground that it is violative of either the State or Federal Constitution. This act does not discriminate against any person or set of persons. Its provisions are broad enough· to embrace all who are guilty of the offense described in the statute. It was intended to and does apply equally and alike to all corporations, partnerships, companies, individuals or associations who "shall create, establish, organize or enter into or become a member of or a party to or in any way interested in any pool, trust, combine, agreement, confederation or understanding with any other corporation, partnership, individual or person or association of persons for the purpose of regulating or controlling or fixing the price of any merchandise, manufactured articles or property of any kind." Nor is there any intimation in the opinions of the Supreme Court that this act is obnoxious to any provision of the. Federal Constitution.

We may also, with equal confidence, assert that section 198 of the Constitution, standing alone, does not contravene any provision of the Federal Constitution, for the simple reason that this section of the Constitution is not self-executing. It does not undertake to punish, prohibit or make unlawful any pools, combinations or other organizations formed for the purpose of depreciating below its real value or enhancing above its real value the cost of any article or created for any other purpose. Standing alone, it is merely a direction to the legislative department of the State to enact such laws as may be necessary to prevent the condition described in the section. Com. v. Grinstead, 108 Ky., 59.

So that, putting aside for the moment the common law doctrine of restraint of trade and the act of 1890, no person or set of persons could be prosecuted or punished for entering into a trust, pool, combination or other arrangement to depreciate below its real value or enhance above its real value the price of any article, if this section of the Constitution were the only authority for such prosecution. Nor under this section alone would the validity of any contract entered into for the purpose of enhancing the cost of any article above its real value or depreciating it below its real value be affected.

It is, therefore, obvious that the vice in the laws of this State pointed out in the Supreme Court decisions is not to be found in the act of 1890 or in section 198 of the Constitution, but in the acts of 1906, 1908 and 1910, as construed by this court in the International Harvester cases and the other cases mentioned. If the acts of 1906, 1908 and 1910 had never been enacted, or if the construction placed on these acts by this court had never been adopted, there could be no objection to the common law or statutory anti-trust law in force in this State. Coming now to the acts of 1906, 1908 and 1910, we find that these acts do not, on their face, amend or purport to amend the act of 1890. They were, as shown by their title and subject matter, independent enactments. Nor, indeed, do they, on their face, purport to have been enacted for the purpose of giving effect to section 198 of the Constitution. The title to the act of 1906 declares that it is "An act permitting persons to combine or pool their crops of wheat, tobacco, and other products, and sell the same as a whole, and making contracts in pursuance thereof valid;" and the body of the act provides that it shall be lawful for any number of persons to pool, combine or unite these crops for the purpose of classifying, holding and disposing of the same "in order to or for the purpose of obtaining a greater or higher price therefor than they might or could obtain or receive by selling said crops separately or individually." The act of 1908 merely amended the act of 1906.

The act of 1910 in its title declares that it is "An act to authorize and regulate the recordation of agreements for pooling farm products," and in its body provides that "Any person buying or soliciting pooled or pledged property, the lists of which have been recorded as herein provided shall, upon conviction, be fined not less than ten nor more than one thousand dollars, or imprisoned not less than fifteen nor more than ninety days, or both so fined and imprisoned."

In 1910, acts other than the one mentioned, intended to strengthen and make more effective the act of 1906, were enacted by the Legislature, but it is not important that we should set out either the title or the purpose of these acts.

In the International Harvester case, in 131 Ky., 551, this court, on the binding authority of Connolly v. Union

Sewer Pipe Co., 184 U. S., 540, 46 L. Ed., 679, was confronted by the situation that the act of 1906, standing alone, and limited in its application to farmers, would be obnoxious to the State as well as the Federal Constitution, and if not so limited would license and authorize all corporations or persons, in whatever business engaged, to combine and unite with other persons or corporations for the purpose of obtaining greater prices for their property or products than could be obtained if they were sold in competition. In writing this opinion it fully understood that if this act were construed to confer on farmers the exclusive privilege of combining and pooling their crops, to the end that a greater price might be obtained therefor, and to deny to other classes the right to combine or pool their products for the same purpose, it would be in direct violation, not only of section 3 of the Bill of Rights, but of the Fourteenth Amendment to the Constitution of the United States.

It further understood that if this act were so construed as to confer upon all corporations and persons the right to combine for the purpose of getting greater prices for their products than could be obtained if they acted independently and in competition with each other, the inevitable result would be that combinations and monopolies would be formed by corporations engaged in the manufacture and sale of necessary articles to farmers and others for the sole purpose of increasing the price of these articles.

To escape these conditions it was thought by a majority of the court that the constitutional objections could be overcome and the alternative objection to removing all restraint on trusts and combinations could be avoided by reading together the act of 1890, section 198 of the Constitution and the act of 1906, and this solution of what was then recognized as a very troublesome question was decided upon. It should also be said that in reaching the conclusion expressed in the 131 Ky., 551, case the court was endeavoring to carry out, in a way that would stand the test of judicial scrutiny when measured by constitutional limitations, the legislative will. If there was any way of escape it was not to be assumed that the Legislature intended that we should have no anti-trust laws in this State, or that it intended to declare that all corporations and persons might combine to get, as expressed in the act of 1906,

a better or higher price for their property than they could or might obtain by selling it separately or as individuals, although the price so obtained might be much more than the real value of the article. It is perfectly manifest from a reading of these acts that the Legislature did not intend to do either of these things, and yet it is certain that one or the other of these alternatives would have resulted if the court had sustained this legislation and adopted any other conclusion than the one reached.

The Supreme Court of the United States, however, found that this construction did not avail to remove the constitutional objection to the legislation when so construed. The effect of the opinions of the Supreme Court in the International Harvester case and in the Collins case is that legislation that makes criminal liability depend upon the question whether the purpose of the pool or combination is to increase or decrease the price of property above or below its real value, cannot be sustained. It is true that the Supreme Court did not rule that this legislation of itself was violative of the Federal Constitution. That question was not before the court. But it did rule that the acts of 1906, 1908 and 1910, as construed by this court, were opposed to the Federal Constitution. A further necessary effect of these opinions is that no valid legislation can be enacted to carry out the provisions of section 198 of the Constitution if the legislation follows the wording of the Constitution and makes either civil rights or criminal liability depend on whether the price of an article is enhanced or decreased above or below its real value. It is true that the question of the validity of legislation of this character in its effect upon contract rights and liabilities was not before the Supreme Court in the cases mentioned. But from the reasoning of the court, especially in the Collins case, there seems no escape from the conclusion that if the question came before the Supreme Court it would hold that contract rights or liabilities depending on the question whether the price of an article had been increased or decreased above or below its real value, could not be enforced, because of the uncertainty of determining whether the value of the article in question had been increased above or decreased below its real value. For example, if, under the act of 1906, or 1910, as construed by this court in the Har-

vester case, a party was sued for selling a pooled crop in violation of his agreement, or for refusing to deliver a crop he had agreed to pool, it would be indispensable to a recovery that the plaintiff should show that the purpose of the pool was not to increase the price of the article above its real value or decrease it below its real value, because if the purpose of the pool was to do either of these things, the contract would be invalid. Owen County Burley Society v. Brumback, 128 Ky., 137. It is, therefore, at once apparent that in the attempted enforcement of civil rights and liabilities under and by virtue of these statutes the same element of uncertainty would arise to prevent the enforcement of the right or liability that would arise in a criminal prosecution for a violation of the provisions of these pooling acts. And if this uncertainty would defeat a criminal prosecution, it would likewise defeat a civil action.

It should, however, be here pointed out that the conclusion we have reached in respect to the effect of these acts on contract rights and liabilities does not go to the extent of holding that mere uncertainty or indefiniteness in a legislative act would prevent the enforcement of civil rights or liabilities arising thereunder if the enforcement of these rights and liabilities may be rested on common law rules. This distinction was made in L. & N. R. R. Co. v. Com., 99 Ky., 132, where the court said that although sections 816 and 819 of the Kentucky Statutes could not, on account of their uncertainty, be made the basis of a criminal prosecution, this did not prevent the shipper from recovering back from the carrier under common law principles the excess of charges over reasonable rates.

In view, therefore, of these Supreme Court decisions, the validity of the acts of 1906, 1908 and 1910 can only be sustained upon the ground that all corporations and persons doing business of any kind in this State shall be permitted to enjoy the same privileges as farmers; namely, to combine, unite and pool their property or products for the purpose of selling them at a higher price than they could obtain if acting separately or in competition with each other, without regard to whether the price at which the property or products was sold was more than their real value or not, and this, of course, would be to say that we had no anti-trust laws in this State.

To put the validity of this legislation upon this ground, which is the only ground on which it can stand, would not only be obnoxious to the whole spirit and purpose of our laws, common and statutory, and the public policy of the State from its very beginning, but would license and authorize all corporations engaged in any kind of business in this State, or selling any kind of articles or products to the people of the State, to combine or unite for the purpose of selling these articles or property to the people of the State at any price they could obtain. A ruling like this would not only be an intolerable departure from the legislative intent in the enactment of the acts of 1906, 1908 and 1910, as expressed in their title and body, but would place the people of the State, who must buy articles of necessity from corporations engaged in their manufacture, absolutely under the control of these corporations, who could, and certainly would, combine and fix the price of these articles at any sum they desired. And to say that the Legislature of the State intended to do this would be setting down a wanton reproach, if not an insult, to the intelligence and public spirit of the members, and this we were not willing to do when the 131 Ky., 551, case was written, and are not willing to do now.

We are, therefore, constrained to hold that the acts of 1906, 1908 and 1910, now sections 3941a, 3941d of the Kentucky Statutes, are void. We are also constrained to overrule the case of the Com. v. International Harvester Co., 131 Ky., 551, and the subsequent cases resting on this opinion.

Thus, putting out of the way these acts and the decisions of this court holding that these acts and the act of 1890 and section 198 of the Constitution should be read together as one harmonious whole, we are now back to the safe place from which we ventured in 1906, and again stand on solid constitutional ground.

This conclusion leaves to be decided the question of the effect of the act of 1890 on the opinions of this court holding that it was amended by the act of 1906. This question is, we think, easy of solution. The validity of a constitutional enactment such as the act of 1890 cannot be impaired or affected by an unconstitutional amendment. The amendment may be held invalid, but the act it amends, if free from constitutional objections, will stand as it did before the unconstitu-

tional amendment. It cannot for a moment be entertained that an unconstitutional amendment to a valid act can destroy the validity of the act. The amendatory act is void from its inception, and may be entirely discarded as unaffecting the original act. People v. Butler Foundry & Iron Co., 201 Ill., 236; Ex-Parte Davis, 21 Fed., 396; City of Lexington v. County Bank, 165 Mo., 671; Whitlock v. Hawkins, 105 Va., 242; Waters-Pierce Oil Co. v. State of Texas, 177 U. S., 28, 44 L. Ed., 657.

Holding that the act of 1890 is now in full force and effect, another question arising is whether the common law doctrine of restraint of trade is also in force in this State, or has it been abrogated or modified by the act of 1890.

In support of the argument that the common law doctrine of restraint of trade is not in force in this State some reliance is placed by counsel for appellants on the case of Gathright v. Byllesby, 154 Ky., 106. In that case it was held on the authority of the International Harvester Company cases that no pool, trust, combination or monopoly was obnoxious to the laws of the State or the public policy of the State unless its purpose was to increase the price of an article above its real value or decrease its price below its real value. And it may be conceded that under the law as declared in the International Harvester cases, the common law doctrine of restraint of trade as set forth in the cases of Gay v. Brent and Merchants' Ice and Cold Storage Co. v. Rohrman, was modified, at least in so far as the doctrine was extended in these cases to include all contracts or agreements entered into for the essential purpose of suppressing competition and trade in an article, although it was not the object of the combination to increase or depreciate the price of the article above or below its real value. But as the rule announced in the International Harvester Company cases is no longer controlling, the state of the law in respect to trusts, combinations and monopolies is the same as it was when the case of Gay v. Brent originated, and when the opinions in that case and in the case of Merchants' Ice & Cold Storage Co. v. Rohrman were written. State v. Rallings, 8 N. H., 550; Mosely v. Brown, 76 Va., 419; Mathewson v. Phoenix Iron Co., 20 Fed., 281.

There is now no public policy or statute law of the State opposed to the recognition of the common law doctrine of restraint of trade.

This doctrine as set forth in Gay v. Brent and Merchants' Ice & Cold Storage Co. v. Rohrman, and the statute of 1890 on the subject of pools, trusts and monopolies are not in conflict. They are living, companion pieces of the law, and either may be invoked, whichever is the most available, for the purpose of staying the unlawful activities of any agreement, pool, trust, combination or monopoly created or entered into by any corporation, partnership or association of persons for the purpose of suppressing competition, controlling the market, or regulating or fixing the price of any species of property.

It follows from the views expressed that the judgment appealed from should be affirmed, and it is so ordered; the whole court sitting.