[S. F. No. 18345. In Bank. Dec. 11, 1953.]

THE PEOPLE, Appellant, v. BUILDING MAINTENANCE CONTRACTORS' ASSOCIATION, INC., et al., Respondents.

*A hearing was granted by the Supreme Court on Dec. 18, 1952.

720

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, B. Abbott Goldberg, Deputy Attorney General, Thomas C. Lynch, District Attorney (San Francisco), and Gregory Stout, Deputy District Attorney, for Appellant.

Landels & Weigel, Francis McCarty and Stanley A. Weigel for Respondents.

TRAYNOR, J.—Plaintiff appeals from an order granting a new trial after judgment was entered against defendants in an action brought to enjoin alleged violations of the Cartwright Act. (Bus. & Prof. Code, §§ 16700-16758.)

The facts are stipulated. Defendants are the Building Maintenance Contractors' Association, an unincorporated association, and its members, who are all building maintenance contractors in San Francisco. The building maintenance industry is defined as "all persons, associations, firms, partnerships and/or corporations participating in the maintenance operation (as distinguished from ownership, leasing or managing), cleaning, painting, renovating and supplying of janitorial service for buildings, lofts and stores in San Francisco." Maintenance contractors are defined as "persons, firms, partnerships and/or corporations engaged, in the building maintenance industry in San Francisco, in the business of contracting, for a fixed term, with owners, lessees or managers of buildings, lofts or stores located in San Francisco to do,

for designated buildings, lofts or stores so located, part or all of any one or more of the following: Window cleaning, janitor work, providing of elevator operators and starters, providing of building engineers for maintaining heating equipment and for minor repairs, providing of night watchmen and providing of powder room matrons.'' There are 44 maintenance contractors in San Francisco of whom 30 are not members of defendant association. Members of the association, however, employ approximately 90 per cent of the total number of employees employed by all maintenance contractors in San Francisco and service approximately 90 per cent of all San Francisco buildings, lofts, and stores serviced by maintenance contractors. Maintenance contractors employ approximately 25 per cent of the employees supplied by various unions for building maintenance, and the remainder of the organized employees are supplied directly to owners, lessees, and managers. The terms and conditions of employment of the organized workers are the same whether they are employed by maintenance contractors or directly by owners, lessees, or managers. All of defendant maintenance contractors service less than one-half of one per cent of the buildings, lofts, and stores in San Francisco.

Defendants have agreed that if bids are called for by any person having an existing, unexpired contract with any member of their association, the members whose bids are solicited will report that fact to the association. The association then makes an investigation to determine whether the price under the existing contract is reasonable, whether the service is satisfactory, and whether the person soliciting bids has any specific reason, no matter how trivial or personal, for dispensing with the services of the current contractor. If the price is found to be reasonable, the service satisfactory, and there is no specific reason for changing maintenance contractors, the members are required to submit bids in excess of the current price. The amount of the excess is determined by a scale ranging from 20 per cent down to 5 per cent of the current price depending on the current job price per month. If, on the other hand, the current price is found to be unreasonable, or the service unsatisfactory, or there is a specific reason for changing contractors, members may submit any bids they see fit. Defendants entered this agreement ''with the intent and for the object and purpose of conducting operations at a reasonable profit, of marketing at a reasonable profit products and services which could not otherwise be so

marketed and of acting in furtherance of trade, and with no other intent whatever nor for any other object or purpose whatever. There is no evidence, except as stated in this stipulation, if any is stated herein, that the effect of the admitted agreement has exceeded, exceeds or will exceed the stated intentions, objects or purposes.''

█ It is clear that defendants' agreement constitutes a trust as defined in section 16720 of the Business and Professions Code.* Not only have defendants agreed to fix the prices at which maintenance service will be provided (§ 16720 (d), (e)), but they have also undertaken to prevent competition among themselves by forcing their customers to pay higher prices if they seek to change maintenance contractors. (§ 16720 (c).) Defendants contend, however, that their agreement is exempted from the prohibitions of the Cartwright Act by virtue of sections 16723 and 16725 of the Business and Professions Code.

Section 16723 provides that ''No agreement, combination or association is unlawful or within the provisions of this chapter, the object and purpose of which are to conduct operations at a reasonable profit or to market at a reasonable profit those products which can not otherwise be so marketed.''

---

*''A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes:

''(a) To create or carry out restrictions in trade or commerce.

''(b) To limit or reduce the production, or increase the price of merchandise or of any commodity.

''(c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

''(d) To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

''(e) To make or enter into or execute or carry out any contract, obligations or agreements of any kind or description, by which they do all or any or any combination of any of the following:

''(1) Bind themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value.

''(2) Agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure.

''(3) Establish or settle the price of any article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity.

''(4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected.''

In *Cline* v. *Frink Dairy Co.*, 274 U.S. 445 [47 S.Ct. 681, 71 L.Ed. 1146], it was held that the same exemption contained in the Colorado Anti-Trust Act left the whole statute "without a fixed standard of guilt" and thus rendered it unconstitutional. In *Speegle* v. *Board of Fire Underwriters*, 29 Cal. 2d 34 [172 P.2d 867], we held that because the exemption was added to the statute by amendment it was separable from the rest of the act. Defendants contend, however, that later decisions of the United States Supreme Court indicate that it would no longer follow the Cline case, and that in any event the state has no standing to challenge the validity of the amendment upon which defendants rely.

Examination of recent cases upholding statutes attacked on the ground of vagueness does not persuade us that the Cline case was wrongly decided or that the Supreme Court would not follow it today. In *Bandini Co.* v. *Superior Court*, 284 U.S. 8 [52 S.Ct. 103, 76 L.Ed. 136], the words "unreasonable waste of natural gas" were found to have an ascertainable meaning in the industry involved. (See, also, *Kay* v. *United States*, 303 U.S. 1, 9 [58 S.Ct. 468, 82 L.Ed. 607].) In *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 [62 S.Ct. 766, 86 L.Ed. 1031], the vague terms of the statute had been given a sufficiently definite and restrictive interpretation by the state court. (*Cf. Winters* v. *New York*, 333 U.S. 507, 518-519 [68 S.Ct. 665, 92 L.Ed. 840]; *Lanzetta* v. *New Jersey*, 306 U.S. 451, 457 [59 S.Ct. 618, 83 L.Ed. 888].) In other cases, although the prohibited acts were defined in vague terms, the statutes were upheld because they required the presence of an adequately defined specific intent. (*Williams* v. *United States*, 341 U.S. 97, 101-102 [71 S.Ct. 576, 95 L.Ed. 774]; *Dennis* v. *United States*, 341 U.S. 494, 515-516 [71 S.Ct. 857, 95 L.Ed. 1137]; *United States* v. *Petrillo*, 332 U.S. 1, 7 [67 S.Ct. 1538, 91 L.Ed. 1877]; *Gorin* v. *United States*, 312 U.S. 19, 27-28 [61 S.Ct. 429, 85 L.Ed. 488]; *Screws* v. *United States*, 325 U.S. 91, 101 [65 S.Ct. 1031, 89 L.Ed. 1495]; *F. & A. Ice Cream Co.* v. *Arden Farms Co.*, 98 F.Supp. 180, 187, and cases cited.) Thus a person who undertakes to evade income taxes by padding his expenses has fair warning that he may violate the law even though he may not be sure where a jury may draw the line between reasonable and unreasonable expenses. (*United States* v. *Ragen*, 314 U.S. 513, 524 [62 S.Ct. 374, 86 L.Ed. 383].) As Mr. Justice Holmes said in sustaining the validity of a statute dealing with contributions for "political purposes," "Whenever the law draws a

line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so it is familiar to the criminal law to make him take the risk.'' (*United States* v. *Wurzbach,* 280 U.S. 396, 399 [50 S.Ct. 167, 74 L.Ed. 508].)

In the present case, however, the vagueness of the words "reasonable profit" infects the whole statutory standard of conduct. An agreement is legal or illegal depending on whether its purpose is to secure reasonable or unreasonable profits. Defendants can know when they have approached the line separating legal from illegal conduct only if they can in some way determine what reasonable profits are. There is no common law background to guide them (*cf. Nash* v. *United States,* 229 U.S. 373, 377 [33 S.Ct. 780, 57 L.Ed. 1232]), and there is no fund of common knowledge or experience that would allow either them or the court to determine what those words mean. Reasonable profits might be defined as those that would permit the payment of reasonable wages and provide a reasonable return on the capital invested. Such a definition, however, would raise serious difficulties in determining what are reasonable wages and a reasonable return on capital. (See, *Connelly* v. *General Const. Co.,* 269 U.S. 385, 393-394 [46 S.Ct. 126, 70 L.Ed. 322]; *United States* v. *L. Cohen Grocery Co.,* 255 U.S. 81, 89 [41 S.Ct. 298, 65 L.Ed. 516].) Moreover, an industry may be inefficient or producing a product about to be driven from the market by a superior substitute. In such cases to obtain profits sufficient to permit payment of reasonable wages and provide a reasonable return on capital would require suppression of efficient competitors or elimination of the competitive substitute. We do not believe that the Legislature intended that reasonable profits should carry a meaning that would permit such a result. On the other hand, we cannot conclude that reasonable profits should be defined as the actual profits realized in a free market. The amendment presupposes that the free market is to be interfered with by an agreement to secure reasonable profits. It would be superfluous if it permitted only those agreements that have no effect on a free market. It may be assumed that in amending the Cartwright Act the Legislature contemplated that economic considerations may justify restraints of trade in certain circumstances. (See *Poultry Producers of So. Calif.* v. *Barlow,* 189 Cal. 278, 284-285 [208 P. 93]; *D. Ghirardelli Co.*

v. *Hunsicker,* 164 Cal. 355, 362-363 [128 P. 1041].) It fell short, however, of expressing its purpose in terms sufficiently clear to be given effect.

Defendants' contention that the state has no standing to attack the validity of the amendment cannot be sustained. ■ It has generally been held that an invalid amendment to a valid statute is ineffective for any purpose. (*Frost* v. *Corporation Commission,* 278 U.S. 515, 526 [49 S.Ct. 235, 73 L.Ed. 483]; *Waters-Pierce Oil Co.* v. *Texas,* 177 U.S. 28, 47 [20 S.Ct. 518, 44 L.Ed. 657]; *Miller* v. *Union Bank & Trust Co.,* 7 Cal.2d 31, 36 [59 P.2d 1024]; *Commonwealth* v. *Malco-Memphis Theatres, Inc.,* 293 Ky. 531 [169 S.W.2d 596, 598]; see, also, *Bacon Service Corp.* v. *Huss,* 199 Cal. 21, 35 [248 P. 235]; anno., 66 A.L.R. 1483.) ■ If the state could not attack the amendment on the ground that it is unconstitutionally vague, it would remain a part of the statutory standard of conduct, and the resulting uncertainty would necessitate invalidating the entire statute. (*Cline* v. *Frink Dairy Co., supra,* 274 U.S. 445, 457.) Accordingly, it follows from the holding that the amendment is separable from the rest of the act (*Speegle* v. *Board of Fire Underwriters, supra,* 29 Cal.2d 34, 47-48), that it must be treated as invalid for all purposes. The problem is well illustrated by cases involving amendments that have been held invalid because they would deny equal protection by exempting certain classes from the operation of preexisting statutes. These cases hold that since the amendments purporting to create the invalid exemptions are void, members of the nonexempted classes are not denied equal protection. (*Waters-Pierce Oil Co.* v. *Texas, supra,* 177 U.S. 28, 47; *Ex parte Davis,* 21 F. 396, 397-398; *Buffalo Gravel Corp.* v. *Moore,* 201 App.Div. 242 [194 N.Y.S. 225, 232], affirmed 234 N.Y. 542 [138 N.E. 439]; *Gay* v. *Brent,* 166 Ky. 833 [179 S.W. 1051, 1058]; *People* v. *Butler St. Foundry & Iron Co.,* 201 Ill. 236 [66 N.E. 349, 356]; *Bacon Service Corp.* v. *Huss, supra,* 199 Cal. 21, 35.) If, however, the state could not rely on the invalidity of the amendments in subsequent litigation against members of the exempted classes, those classes would escape the operation of the statutes and equal protection would be denied to those not exempted.

■ Defendants contend that their agreement is lawful under the provision of section 16725 of the Business and Professions Code providing that "It is not unlawful to enter into agreements or form associations or combinations . . .

which are in furtherance of trade." This provisions is the converse of subdivision a of section 16720, which defines an invalid trust as one created "to carry out restrictions in trade or commerce." Since the Cartwright Act articulates in greater detail a public policy that has long been recognized at common law (*Speegle* v. *Board of Fire Underwriters, supra,* 29 Cal.2d 34, 44), these provisions must be considered in the light of common-law precedents. Moreover, it may be assumed that the broad prohibitions of the Cartwright Act are subject to an implied exception similar to the one that validates reasonable restraints of trade under the federal Sherman Antitrust Act. (See *Standard Oil Co.* v. *United States,* 221 U.S. 1, 60 [31 S.Ct. 502, 55 L.Ed. 619].) Under the Sherman act, however, agreements fixing prices are "illegal *per se.*" (*Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U.S. 384, 386 [71 S.Ct. 745, 95 L.Ed. 1035, 19 A.L.R.2d 1119], and cases cited.) Similarly it has generally been held that such agreements are invalid in this state both at common law and under the provisions of the Cartwright Act. (*Speegle* v. *Board of Fire Underwriters, supra,* 29 Cal.2d 34, 44; *Endicott* v. *Rosenthal,* 216 Cal. 721, 726 [16 P.2d 673]; *People* v. *H. Jevne Co.,* 179 Cal. 621, 625 [178 P. 517].) An exception was recognized permitting a manufacturer to enter valid contracts with retailers fixing the price at which his product might be sold (*D. Ghirardelli Co.* v. *Hunsicker, supra,* 164 Cal. 355, 362; *Grogan* v. *Chaffee,* 156 Cal. 611, 614 [105 P. 745, 27 L.R.A.N.S. 395; see Bus. & Prof. Code, §§ 16900-16905), and in *Herriman* v. *Menzies,* 115 Cal. 16 [44 P. 660, 46 P. 730, 56 Am. St.Rep. 82, 35 L.R.A. 318], it was held that an agreement between stevedoring firms with respect to prices was not invalid when it appeared that the firms in question constituted only an insignificant part of those engaged in the business and had no power to control prices generally.

Defendants contend that the Herriman case is controlling here because they service less than one-half of one per cent of the buildings serviced in San Francisco. The Herriman case was decided before the Cartwright Act was adopted in 1907, and in view of the specific provisions of the act with respect to price fixing that case is no longer controlling. (*People* v. *H. Jevne Co., supra,* 179 Cal. 621, 625; see *United States* v. *Trenton Potteries Co.,* 273 U.S. 392, 397 [47 S.Ct. 377, 71 L.Ed. 700].) In any event, defendants do not constitute an insignificant part of the building maintenance industry

in San Francisco. That industry consists of those persons and firms who contract to supply building maintenance service to owners, lessees, and managers, and defendants' operations constitute approximately 90 per cent of those of the industry as a whole. It is immaterial that the great majority of owners, lessees, and managers maintain their buildings without the assistance of maintenance contractors. In addition to material and labor, such contractors supply valuable managerial services, and defendants' agreement materially reduces competition in the supplying of such services and affects the prices at which they are available.

 Defendants contend that their agreement is valid because it operates only to prevent tortious interference with existing contract rights. They point out that a member of the association is required to submit a higher bid only if the person soliciting the bid has an existing unexpired contract with another member, and contend that the purpose of requiring the higher bid is to avoid inducing a breach of the existing contract. It is unnecessary to decide whether such a purpose or effect would validate an agreement otherwise prohibited by the Cartwright Act. Defendants' agreement goes much further. Ordinarily a person soliciting bids for maintenance service would do so in advance of the expiration date of his current contract, not for the purpose of breaching his contract, but to avoid interruption of service in the event that he should not wish to renew it. Thus in the usual situation defendants' agreement does not operate to prevent interference with existing contract rights, but rather to fix prices and restrict competition in the future.

 Defendants finally contend that the judgment is erroneous because it enjoins them from "Formulating, promoting, participating or combining in any understanding, compact, scheme, plan or agreement to raise, fix, adhere to or maintain prices for the furnishing of labor, material and services in the building maintenance industry," without distinguishing between agreements among themselves in restraint of trade and legal contracts with their customers establishing prices for particular jobs. In the commonly accepted sense of the term, however, a price fixing agreement is not one whereby one party merely agrees to supply goods or services to another at a given price, but one whereby the parties seek to determine the price at which goods or services shall be offered to third parties. (See *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U.S. 384, 386 [71 S.Ct. 745, 95 L.Ed.

1035, 19 A.L.R. 1119]; *Endicott* v. *Rosenthal*, 216 Cal. 721, 725-727 [16 P.2d 673]; *Max Factor & Co.* v. *Kunsman*, 5 Cal. 2d 446, 464 [55 P.2d 177]; Bus. & Prof. Code, §§ 16720, d, e (1), (2), (3); 16902.) ■ Thus the injunction cannot reasonably be interpreted as prohibiting defendants from contracting with their customers to provide services at such prices as the customers may agree to pay. It only enjoins defendants from agreeing among themselves to engage in the prohibited activities.

Since the stipulated facts support the judgment as entered and there is no evidence that would support a contrary conclusion, the order granting a new trial is reversed.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., and Spence, J., concurred.

Edmonds, J., concurred in the judgment.