[Civ. No. 457.   Fifth Dist.   Apr. 26, 1965.]

THE PEOPLE, Plaintiff and Appellant, v. INLAND BID DEPOSITORY, Defendant and Respondent.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Wallace Howland, Assistant Attorney General, Elizabeth Miller, Vincent W. Thorpe and Otto J. Hetzel, Deputy Attorneys General, for Plaintiff and Appellant.

Julian O. von Kalinowski, Shari L. Dennis, Carl D. Lawson, Gibson, Dunn & Crutcher, John Lonergan, Lonergan & Jordan and Robert E. Cooper for Defendant and Respondent.

BROWN (R.M.), J.—This is an appeal by the appellant from a final judgment and a modified final judgment entered in the above action with regard to a complaint for an injunction and other equitable relief against restraints of trade by the defendants.

It was alleged in the amended complaint that the defendant Inland Bid Depository, hereinafter referred to as IBD, its members and users, and Allied Construction Industries [ACI] (not involved in this appeal, a judgment by stipulation having been entered against it) were engaged in an unlawful combination and conspiracy in restraint of trade in the bidding on and construction of public projects in Riverside and San Bernardino Counties in violation of Business and Professions Code sections 16720, subdivisions (a), (e) (4), and 16726.

After a trial the court issued a memorandum decision stating that violations of Business and Professions Code section 16720, subdivisions (a), and (e) (4) had been proved and plaintiff was entitled to a decree enjoining defendant IBD and its members from doing the illegal acts charged, and also decreed that IBD would be dissolved unless, within 60 days, it submitted to the court a set of proposed rules and regulations and a plan for the operation of its bid depository of which the court approved. Subsequently, IBD submitted a proposed set of rules and bylaws and filed a motion for modification of the judgment, which was so modified allowing IBD to operate under said proposed rules.

Deeming itself a party aggrieved by the inadequacy of the relief granted (Code Civ. Proc., § 938), the plaintiff filed a notice of appeal from the final judgment and from the modified final judgment.

Public awarding authorities who plan to construct buildings set a specific bid opening time before which prime bids from general contractors for the specific project must be received. To prepare such a bid the general contractor must first determine the cost of work which he will do with his

own forces or computed by adding up the lowest responsible subbids received from competing subcontractors in each trade area. From the testimony, it appears that subcontractors start submitting bids in their respective trades to the general contractors from two to six or more hours before the awarding authority's bid opening time. General contractors seldom place a closing time for the receipt of subbids though they have a right to do so.

The defendant Inland Bid Depository was organized in 1959 for the purpose of modifying or acting upon these normal competitive practices by processing bids of subcontractors and delivering those bids to general contractors. IBD operated primarily on public projects in Riverside and San Bernardino Counties, its members comprising a majority of the subcontractors in 16 trades in those areas. During the years 1959-1960 IBD processed a majority of the total dollar volume of the public projects.

Under the original IBD rules, rule 6D set forth that subcontractors who signed the rules or submitted a bid in accordance with the rules could not submit a bid to a contractor who did not use the depository; or the general contractor, in order to receive his bids from the IBD subcontractors was required to sign a bid acceptance form in which he agreed not to use any subcontractor's bid not processed by IBD. The subcontractors, as members of IBD, were required to submit their bids on forms to the depository for processing four "business" hours before the official prime bid opening time for a given public project. These bids were received and tabulated in each trade and then handed to the general contractor. A subcontractor could withdraw his bid only if he did so from all general contractors and paid a fine, and if successful, paid a fee of ½ of 1 per cent of the dollar amount of his subcontract. The general contractor agreed to use only the lowest subbid in any given trade processed through IBD. IBD enforced this rule either by fining, suspending of expelling its members.

Subcontractors belonging to IBD did not submit bids to outside general contractors (those not using IBD). Such subcontractors were prohibited from doing so by this rule 6D.

General contractors who did use IBD did not consider or use bids received from outside subcontractors unless such bids were received prior to the IBD closing time of four "business" hours before the awarding authority's bid opening time and

were deposited with IBD by the general contractor for processing.

It is contended by the appellant that from the record, the effect of such group boycotting resulted in higher prime bids being submitted by the general contractors to the public authorities than would otherwise have occurred, and resulted in excess costs where the general contractor was not able to use IBD subcontractors; or, that where such IBD procedures were used, the general contractor became bound to accept those bids which were higher and could not use subbids actually made available outside of IBD even though they were lower.

The findings of fact and conclusions of law establish that the agreed upon rules of IBD were collectively in unreasonable restraint of trade, and specifically held that the agreements of subcontractors and general contractors entered into pursuant to said rules constituted illegal group boycotts and price tampering, and portions of those findings pertinent to this appeal are quoted below.[1]

The court also found that the increase in building costs

---

[1] "XI

"The general contractor's bid acceptance form provided by IBD, which general contractor-users were required to sign before receiving any subbids from IBD by Section 10B of the rules and regulations (as revised September 1, 1959), provides as follows:

" 'In the event the undersigned is awarded the general contract for the said project by the awarding authority, the undersigned agrees to accept the bid of the bidder above named who submits the lowest of the said bids so received, provided it complies with the rules and regulations of the Inland Bid Depository. The undersigned reserves the right to reject the low bid so submitted to the undersigned if the person submitting the same shall not upon the request of and at the expense of the undersigned and at the established charge therefor furnish to the undersigned a bond issued by an authorized surety company wherein the undersigned shall be named the obligee, guaranteeing prompt and faithful performance of said bid and the payment of all claims for labor and materials furnished or used in and about the work to be done and performed under said bid.

" ' .   .   .   .   .   .   .   .   .   .   .   .   .   .'

"The general contractor's bid acceptance form in use by IBD on and after February 27, 1961, includes the following:

" 'In the event the undersigned is awarded the general contract for said project by the awarding authority, he (it) agrees, as to each separate trade or craft listed above, to accept the bid of the bidder above named who has submitted the lowest of said bids so received and listed above under such trade or craft and to award the subcontract for this particular trade or craft to such low bidder (provided the bid complies with the Rules and Regulations of Inland Bid Depository).

" 'The undersigned agrees to pay to Inland Bid Depository all depository fees payable by the undersigned under the Rules and Regulations of Inland Bid Depository.

" 'The undersigned is familiar with the Rules and Regulations of Inland Bid Depository, as amended effective February 27, 1961, and

brought about by the operations of defendant is de minimis; that IBD was formed and operated in good faith; that the formation and operation of IBD had not adversely affected the construction or building activity or resulted in any coercion or intimidation of persons or firms engaged in the construction industry; and that at no time has there been any collusion or unfair practice by IBD.

In its conclusions the court held that the defendant IBD

agrees to abide by and comply with said Rules and Regulations to the extent that they apply to General Contractors. . . .'

"XII

". . . . . . . . . . . .

"XIII

"From the period of its incorporation in February of 1959 to July 1, 1960, IBD processed approximately 96 projects, 86 of which were public projects. All of these projects were located in the Inland Counties Trade Area. Contracts were actually awarded on 80 of these projects. Of these 80 projects, in each of approximately 75 the prime contract was awarded to a general contractor who obtained his subbids in one or more of the several subtrades involved in the project, and not performed by the general contractor himself, through IBD. The total dollar volume of the general contractor's contracts in such 75 projects was approximately $18,000,000. Approximately 58%, or $10,000,000, represented the dollar volume of the amount of work and material furnished by subcontractors who were competing with each other for the contract award from the successful general contractor.

"XIV

"Under the original rules (Plaintiff's Exhibits 26, 27), general contractors who receive subbids from IBD as a condition of such receipt were required to and did sign the general contractor's bid acceptance form and thereafter complied with its provisions.

"A general contractor user who was awarded a contract on a public project processed by IBD agreed to and usually did pay to IBD a fee of one-half of one per cent of the amount of such subbid with a minimum fee of $5.00, whenever the rule required the payment of such fee.

"During the period September 1, 1959, to April 1, 1960, general contractor users also agreed to and did accept and use a subbid in a given subcontractor trade classification even though only one subbid was received in such classification by IBD and given to the general contractor user.

"General contractor users who did not comply with the IBD rules and regulations were denied access to the bids of subcontractor-member-users during suspension periods determined by the IBD Executive Board.

"XV

"The contracts created by the signing of the general contractor's bid acceptance form prevented general contractor users from considering the subbids of nonuser subcontractors in compiling their prime bids to awarding authorities even though the bid of such nonuser subcontractor was lower than the bids of subcontractor member-users.

"XVI

"The IBD requirement that general contractors sign the general contractor's bid acceptance form before receiving any subbids from sub-

and defendant ACI have combined, conspired and entered into contracts in unreasonable restraint of trade and commerce in violation of sections 16720, subdivision (a), 16720, subdivision (e)(4), and 16726 of the Business and Professions Code and that the combined effect of the adoption and enforcement by IBD of the rules and regulations operated to unreasonably restrain the trade and commerce involved in the building and construction of public projects. The conclusions also set forth IBD rules 4B, 4C, 6D, 7A, 7B, 9D, 9G, 10A, 10B and 13A. The court also concluded that the agreements of the subcontractor-users of IBD not to bid to general contractors who did not sign the general contractor's bid acceptance form constituted a group boycott and a tampering with the pricing practices of the construction industry and that the agreements of the general contractor-users not to accept or consider subbids of subcontractors who were not IBD users constituted a group boycott and a tampering with pricing practices.

Operation of the injunction provision of the judgment was stayed by the court until May 29, 1962, at which time the injunction would become effective unless IBD submitted proposed new rules. Subsequently new proposed rules were submitted and approved by the court as shown by the modified

---

contractor member users prevented general contractors who did not sign such form from receiving subbids from subcontractor member-users, even though such subbids were lower than any received by the nonuser general contractor.

"XVII

"Under the original rules (Plaintiff's Exhibits 26 and 27) subcontractor member-users, as to each project, agreed to and did refuse to bid to any general contractor who did not sign the IBD general contractor's bid acceptance form; agreed to and did submit their subbids to general contractor users at least four hours prior to bid opening time except where bid opening time was prior to 1:00 p.m., in which case the subbids were submitted to IBD before 4:00 p.m. of the preceding IBD working day; agreed to and did refrain from withdrawing any subbids so submitted unless the withdrawal was made one hour or more before bid opening time and the subbid was withdrawn from all general contractors to whom it had been submitted and a penalty of one-half of one per cent of the amount of the subbid, but not less than $5.00 nor more than $250.00 on any project was paid to IBD; and agreed to and did, whenever awarded a subcontract on a depository project, pay to IBD a fee of one-half of one per cent of the amount of his subbid, but not less than $5.00. Subcontractor member-users who did not comply with the IBD Rules and Regulations were penalized and suspended from the privilege of using IBD for the period of the suspension imposed by the IBD executive board.

"XVIII

"Subcontractor member users of IBD who violated the provisions of section 6D of the Rules and Regulations of IBD were subjected to the imposition of sanctions by IBD for such violations. . . ."

final judgment. ▆▆▆ By both the final and the modified final judgments, paragraph IV, the court permanently enjoined and restrained IBD from operating a bid depository the rules of which:

"(B) prevent, preclude or in any manner limit any subcontractor from submitting a bid to a general contractor or awarding authority on any construction project, at any time *which is four hours or more* prior to the time set by the awarding authority for the receipt of bids upon any such construction project;

"(C) limit or restrict, in any way, the amount of a bid submitted by a subcontractor to a general contractor or awarding authority at any time *which is four hours or more* prior to the time set by the awarding authority for the receipt of bids upon a construction project;

"(D) limit or in any way prevent a general contractor or awarding authority from receiving or considering any bid which is or may be submitted to him by a subcontractor at any time *which is four hours or more* prior to the time set by the awarding authority for the receipt of bids upon a construction project." (Italics added.)

Thus, the clause "which is four hours or more" in each of the above leaves the state without any injunctive relief whatsoever concerning bidding procedures applicable to and bids submitted during the four-hour period immediately preceding the time set for the receipt of prime bids from general contractors on any construction project.

The record indicates that the four-hour period prior to the opening of the prime bids is one of intensive price competition on the part of subcontractors, and thus there is no restraint placed upon IBD from continuing the group boycotts and their tampering with pricing practices of the construction industry which they are prevented from doing up to the four-hour period. (The new IBD rules approved by the court fixed the period at three hours instead of four hours for opening of subcontractors' bids.)

It is appellant's contention that the clause "which is four hours or more" in any form should be deleted from the modified final judgment or that IBD should be ordered dissolved in line with the modified final judgment ordering the same if no rules were filed and approved.

In *Christiansen* v. *Mechanical Contractors Bid Depository,* 230 F.Supp. 186, the court was concerned with a rule (rule V) which provided that "It is to be explicitly understood that the

depository will forward bids to general contractors making request therefor with the understanding that the general contractor will use only bids thus received from the depository in preparing his bid.'' (P. 188.) While in that case the depository argued that such restraints in this and other rules were reasonable and thus justified by a rule of reason, the court stated that it could not be deemed anything but a per se violation, whether standing alone or in combination with other provisions or regulations, and such was an unreasonable restriction on competition. The rule V there, is somewhat comparable to rule 8B in our case, which provided that the contractor could use one outside bid and one inside bid without being bound by the rules of the depository, but if it used two or more bids it had to take the lowest of the depository bids.

Much reliance has been placed on *United States* v. *Bakersfield Associated Plumbing Contractors, Inc.*, 1958 Trade Cases, paragraph 69,087, page 74,296 (Jertberg, District Judge), and 1959 Trade Cases, paragraph 69,266, page 75,035 (Yankwich, Chief District Judge). Judge Yankwich modified the earlier opinion which set forth certain rules of the depository. He prohibited certain practices (p. 75,037) but also provided that bid openings should be open to the public at least six hours prior to the time specified by the awarding authority and that the general contractor should receive the bids at least two hours prior thereto. The court approved the method of operating the bid depository as not violating the anti-trust laws of the United States ''provided that the defendant in so operating it, in all other respects be subject to all the provisions of this judgment.'' The decision by Judge Jertberg held that the defendants had conspired to restrain trade in violation of the Sherman Act which the court held constituted price tampering and was illegal per se (p. 74,305). These rules were enjoined in this case as well as by Judge Yankwich in the revised rules. It will also be noted that the *Bakersfield* rules provided for a public bid opening (p. 75,037). The theory of the public bid opening as set forth in the *Bakersfield* case was objected to by the respondents in this case as making it ''useless for IBD to further try to operate.'' Such a public exposure of IBD bids would, it is claimed, as a practical matter, prevent open price competition during the period of time after IBD closes. The general contractor would be able to use such bids to obtain open price competition independent of IBD operations. This would, in effect, be suppressed by IBD operations.

In effect, the revised rules 4A, 4B, 4E, 5A and 8B[2] permit IBD to carry on the illegal restraints of trade.

To require the general contractor to employ the lowest bid under 8B, at a time when he had seen no other subbids, would

[2]*Portion of Approved Revised Rules*

"Section 4. SUBMISSION OF BIDS BY SUBCONTRACTORS:

"A. Any member subcontractor, and any other subcontractor who executes an agreement as hereinafter in this Paragraph A provided, who desires to submit to any general contractor a bid or bids for the performance of construction work involving any of the specialized building trades or crafts on any construction project designated by the Executive Committee or its delegate, shall submit each such bid only in accordance with the procedure set forth in these rules. Any subcontractor, although not a member, may utilize the services of IBD for any such project upon executing an agreement to comply with and be bound by these rules as to such project. A bid to a general contractor shall be submitted in accordance with the following procedure.

"B. Bids to general contractors shall be prepared in quadruplicate, and shall be executed in duplicate. Each signed duplicate shall be deemed an original for the purposes of bidding and of these rules. Each of the executed duplicate originals shall be sealed in an envelope by the bidder and each such envelope shall be directed to a specific general contractor or any or all general contractors to whom the bid is to be made. The envelope containing one such sealed duplicate original shall be filed with IBD for the general contractor to whom the subcontractor desires to bid. It shall be accompanied by a fully conformed copy (not the remaining duplicate original) of such original bid, likewise sealed in an envelope addressed to IBD. Both sealed envelopes shall specify on their exteriors the name of the subcontractor (or subcontractors), the project upon which the bid is made, and the trade or craft or other portions of the work covered by the bid. The remaining sealed duplicate original bid may be delivered by the bidder to the general contractor (or contractors) as provided in Paragraph C hereof. The extra conformed copy shall be the bidder's retained copy.

" . . . . . . . . . . .

"E. Member subcontractors, and any other subcontractor who delivers a sub-bid to IBD for delivery hereunder and who is therefore bound by these rules, shall not submit such bid or any other bid to any general contractor on the same project except in accordance with the provisions of these rules.

" . . . . . . . . . . .

"Section 5. TIME AND DETAILS OF DEPOSIT AND FILING:

"A. All bids deposited under Paragraph B of Section 4, above, and copies filed with IBD must be received by IBD normally not later than three (3) hours prior to the time designated for the opening of bids by the Awarding Authority, so as to be available for the general contractors; provided, however, that if the time designated by the Awarding Authority for opening bids is such that deposit three (3) hours prior thereto would not be during normal IBD office hours, then IBD shall determine and designate the time at which bids must be deposited, but the same shall not substantially vary from three (3) business hours of IBD. Normal IBD office hours for these purposes are established as 9:00 AM to 5:00 PM of each working day. A working day is established as each day, Monday through Friday, inclusive, of each week, exclusive of legal holidays. In the event of special time designated by IBD as above provided, all bidders known to be interested in bidding on the project shall be notified by IBD as much as reasonably

be detrimental to the public, leading to collusion by the subcontractors and ruinous to the construction industry.

This appeal does not involve the findings of fact or conclusions of law but only that portion of the judgment (pars. IV (B), (C) and (D)) which enjoins IBD from operating the depository under rules concerning the four-hour period, as set forth hereinabove.

It will be unnecessary for us to set forth the public policy against group boycotting and price tampering. (See *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U.S. 219 [68 S.Ct. 996, 92 L.Ed. 1328]; *Silver* v. *New York Stock Exchange*, 373 U.S. 341 [83 S.Ct. 1246, 10 L.Ed.2d 389]; *People* v. *Sacramento Butchers' Protective Assn.*, 12 Cal.App. 471, 481 [107 P. 712]; *Standard Sanitary Mfg. Co.* v. *United States*, 226 U.S. 20 [33 S.Ct. 9, 57 L.Ed. 107]; *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150 [60 S.Ct. 811, 84 L.Ed. 1129]; *Northern Pacific Railway Co.* v. *United States*, 356 U.S. 1 [78 S.Ct. 514, 2 L.Ed.2d 545]; and *People* v. *Building Maintenance etc. Assn.*, 41 Cal.2d 719, 727 [264 P.2d 31].) ■ Group boycotts are illegal per se. (See *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U.S. 207 [79 S.Ct. 705, 3 L.Ed.2d 741]; *United States* v. *Frankfort Distilleries*, 324 U.S. 293 [65 S.Ct. 661, 89 L.Ed. 951]; *Associated Press* v. *United States*, 326 U.S. 1 [65 S.Ct. 1416, 89 L.Ed. 2013]; *Radiant Burners, Inc.* v. *Peoples Gas Light & Coke Co.*, 364 U.S. 656 [81 S.Ct. 365, 5 L.Ed.2d 358]; *Silver* v. *New York Stock Exchange, supra*; *Eastern States Retail Lbr. Dealers' Assn.* v. *United States*, 234 U.S. 600 [34 S.Ct. 951, 58 L.Ed.

---

possible in advance of the time of deposit. Bids received later than the time herein provided shall be returned to the bidder unopened.

"      .      .      .      .      .      .      .      .      .      .      .      .

"Section 8. Delivery of Bids:

"A.      .      .      .      .      .      .      .      .

"B. If the general contractor elects to receive none of the bids or only one bid on any particular craft or trade, he is free to obtain or receive bids from any member or nonmember subcontractor, whether or not they deposited a bid for him with IBD under section 4 hereof. If a general contractor elects to receive delivery through IBD of two or more bids for a trade or craft, he shall be obligated, and he hereby agrees, that if he is the successful prime bidder and receives an award of the general contract, he will award the contract for this particular trade or craft to the lowest bidder whose bid he received through IBD. As used in these rules, 'received through IBD' shall include, for this purpose, bids delivered by a subcontractor direct to the general contractor when executed duplicate originals thereof were deposited with IBD by the subcontractor under Section 4 hereof, regardless of whether the general contractor received the same from IBD under Paragraph A of Section 8 hereof.

"      .      .      .      .      .      .      .      .      .      .      .      .      ."

1490, L.R.A. 1915A 788]; *Overland Pub. Co.* v. *H.S. Crocker Co.*, 193 Cal. 109 [222 P. 812]; *Speegle* v. *Board of Fire Underwriters*, 29 Cal.2d 34 [172 P.2d 867].)

Appellant contends that the trial court having found that these per se violations of the law existed, was required to grant relief which would prevent their reoccurrence. (See *Local 167, I. B. T. C.* v. *United States*, 291 U.S. 293 [54 S.Ct. 396, 78 L.Ed. 804]; *Ethyl Gasoline Corp.* v. *United States*, 309 U.S. 436 [60 S.Ct. 618, 84 L.Ed. 852]; *United States* v. *Crescent Amusement Co.*, 323 U.S. 173 [65 S.Ct. 254, 89 L.Ed. 160]; Bus. & Prof. Code, § 16754.5.)

While the appellant objects to the word "collectively" being used by the trial court in connection with the violation of any of the substance of the rule set forth by the court, it also having objected at the time it was inserted, appellant maintains that the word "collectively" fails to prohibit, as requested by appellant, a new plan of IBD operation which continued with impunity the group boycotts and price tampering of the old rule as long as at least one or two of the other rules were changed.

The appellant, before the judgment was entered, urged the exclusion of the "four-hour" period in paragraph IV (B), (C) and (D). As originally suggested by the appellant, it would have enjoined any agreement by subcontractors embodied in an IBD rule from preventing or limiting any subcontractor or general contractor at any time prior to the general bid opening time. However, the trial court stated that it had not found any hiatus in time between the deposit of the bid and the opening hour of the awarding authority as necessarily violative. During this four-hour period it was maintained that the defendant IBD and its members were left free to pursue the very practices held to be illegal and characterized by the court to be group boycotts and price tampering in its conclusions Nos. 4, 5 and 6. In other words, boycotts and other restraints, illegal per se, were enjoined by the court only with respect to submission of bids by such nonmembers when this occurred more than four hours in advance of the bid opening time. The evidence shows that during the period immediately preceding the awarding authority's time for receipt of bids from the general contractor is precisely the time of the most intensive competition by the subcontractors, even to the last few minutes, when bids are frequently lowered and the general contractor is

able to put together a successively lower prime bid as the time for the general contractor's submission of his bid approaches.

Paragraph IV (C) relates to agreements resulting in illegal price tampering and, without the four-hour limitation, would have enjoined IBD rules or operations which would limit or restrict in any way the amount of bids submitted to a general contractor by a subcontractor. By reason of the clause "which is four hours or more," the court enjoined only those price fixing rules which might have been submitted four hours or more prior to the time set for receipt of prime bids by the general contractor. The resulting injunction expressly excludes from its scope tampering with price bids during the period less than four hours which the evidence showed to be the most active and competitive period of bidding.

Paragraph IV (D) relates to group boycotts by general contractors. In the trial court's conclusion No. 4 it concluded that the agreement of the general contractors not to accept or consider the subbids of subcontractors who were not IBD users constituted a group boycott. Under the rules, the general contractor was required to sign the acceptance forms as a condition precedent to his receiving bids from any of the IBD subcontractors. Such restraints were enjoined by IV (D). ■■■ The presence of the wording of the period of "four hours or more" in both judgments, in effect does not enjoin a boycott to enforce a bidding rule with a time period of less than four hours.

Appellant admits that it is not concerned with the reasonableness or unreasonableness of restraints resulting from respondents' bidding practices. It has made no attack on the court's findings of fact or conclusions of law, nor has it attacked the reasonableness or unreasonableness of the four-hour rule or any other period—only that it should not exist at all. The time limit is significant because it implies that the court failed to distinguish between the object of an agreement and concerted action between competitors and the means adopted to achieve it.

We think that the appellant correctly interprets the four-hour clause or any period preceding bid opening time as effectively denying the relief which the law requires to be granted in this case. Immediately preceding the general bid opening time the court granted relief to the respondents to allow them to continue such group boycotts and expressly

authorizes illegal boycotts and other per se restraints of trade.

Under the revised rules members of IBD are bound by written agreement to bid to general contractors only in accordance with procedures set forth in the revised rules, rule 4A. The general contractor must agree to accept bids delivered through IBD of two or more bids for a trade or craft and take the lowest bid that he received through IBD (rule 8B), must agree that no bids can be received by IBD except in accordance with the rules until the general contractor shall have signed the bid acceptance form and agreed to abide by the rules, and that a member subcontractor shall not submit any bids to any general contractor except in accordance with the provisions of the rules (rule 4E).

In *United States* v. *San Francisco Electrical Contractors Assn.*, 57 F.Supp. 57, the provisions for a depository provided that the customer as the prime contractor could, himself, fix through the registry the closing time for subbids. Failing to do such, the registry office would fix a date beyond which no subbids would be received. After this closing time the jobbing prices became frozen for 90 days, no one being permitted to make another subbid. However, in reading this case, it is noted that this was not applied to public works projects and would not be dependent in any way on the prime contractor's obtaining such a bid. The general contractor was not required to use the depository and if he did he could award the subcontract to any bidder, high or low, or was free to choose his bidder from free-lance subcontractors. In practical effect, the time limit compelled the customer to choose from subbids so frozen, for a 90-day wait might interfere with his work-in-progress schedule or delay unreasonably the construction for which the electrical installations were sought. The court stated: "So here, the most that the depository system achieved was to substitute *limited and restricted* for *unlimited and unrestricted bidding*. It did not prevent an electrical contractor from doing business as a 'free lance' outside the depository system." (P. 66.)

■ Where general contractors who are awarded prime contracts formally solicit a lower bid from a subcontractor using another subcontractor's bid in computing a prime bid, the practice is known as "bid chiseling," and this is not now permitted under the Bid Listing Law, Government Code sections 4102 and 4103.

■ "Bid peddling" however is a situation occurring before the prime contract is awarded. It involves all general

contractors who intend to bid for the prime contract. "Bid peddling" or "shopping" by general contractors among rival subcontractors to obtain a lower bid than is already received in the trade is defined as "shopping" by general contractors, the purpose being to obtain still lower quotations. In this situation, the lower the subcontractor's bid, the lower the general contractor can make his own bid for the prime contract. The real beneficiary of each lower price is not only the general contractor, but the awarding authority.

Respondent sets forth that the general purpose of the depository and the rules adopted was to give the general contractor more time to compile his bids without exposing the subcontractors to the hazards of having their bids disclosed to rivals.

This court has the power to modify the final judgment and strike therefrom the clause "which is four hours or more" as it appears in subparagraphs (B), (C) and (D) of paragraph IV. This is authorized by Code of Civil Procedure section 53. (See also *Burke* v. *Norton*, 42 Cal.App. 705, 711-712 [184 P. 45].) However, we have concluded that the judgment must be reversed and that the trial court must modify the judgment by striking from subparagraphs (B), (C) and (D) of paragraph IV thereof the language "which is four hours or more," and the defendant Inland Bid Depository be given a reasonable time, if it so desires, to submit new rules in conformity with the views of this opinion which would comply with the injunction in the modified final judgment and the final judgment as granted, to the end that open competition is available to all bidders, whether a member or not of IBD.

The judgment is reversed with directions to the trial court to carry out the directions hereinabove stated.

Conley, P. J., concurred.

STONE, J.—I dissent. As I view the rules of the Inland Bid Depository they do not violate the Business and Professions Code sections mentioned in the majority opinion, which sections are, in essence, codifications of the Cartwright Act. The core of the difficulty lies in the fact that only one contract for an entire job is let to the general contractor. If the electrical, heating, plumbing, sheet metal, plastering, or any other subcontractor, wants to do business at all, he must do it with the general contractor. This control over subcontractors by general contractors has led to instances of "bid peddling" and "bid chiseling."

The purpose of the bid depository is not to create a monopoly for the subcontractors, but to protect them from economic oppression by those who hold the power to give or deny a subcontract. I do not view concerted action to counterbalance economic bargaining power as either monopolistic in purpose or in restraint of trade. As the majority opinion points out, the federal courts have held there is no violation of the Sherman Anti-Trust Act by subcontractors who enter into bid depository agreements similar to the one here.

To delete the four-hour provision from the rules before us is to defeat the basic purpose of the bid depository system. This emasculation of the depository principle can be justified only by holding that the agreement violates the Cartwright Act, a holding with which I cannot agree.

A petition for a rehearing was denied May 24, 1965. Stone, J., was of the opinion that the petition should be granted.