CULLUM ELECTRIC & MECHANICAL
INC., Plaintiff,

v.

The MECHANICAL CONTRACTORS
ASSOCIATION OF SOUTH
CAROLINA, Defendant.

Civ. A. No. 75–980.

United States District Court,
D. South Carolina,
Greenwood Division.

July 5, 1976.

J. Kendall Few, Anderson, S. C., Robert M. Erwin, Jr., Greenwood, S. C., for plaintiff.

L. G. Funderburk, Funderburk & Derrick, P. A., L. Henry McKellar, Columbia, S. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HEMPHILL, District Judge.

Plaintiff in this action is located in Greenwood, South Carolina and is engaged in contracting for the installation of various electrical, heating and air conditioning equipment and systems. Defendant is a trade association whose members include the majority of the licensed mechanical contractors in South Carolina who compete with plaintiff. This suit arose out of plaintiff's failure to secure the contract for mechanical work on the Lander College Library for which construction commenced in Greenwood, South Carolina in 1975. The complaint alleges that the regulations and conduct of the Mechanical Contractors Association (hereinafter MCA), in connection with this and other construction jobs, violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and plaintiff seeks actual monetary damages trebled pursuant to 15 U.S.C. § 15 and invokes 15 U.S.C § 26

for injunctive relief from defendant's allegedly illegal conduct.

There is little dispute between the parties concerning the relevant facts, and the majority of the evidence was placed before the court in plaintiff's proposed transcript of record, to which both parties agreed at a pretrial conference held March 22, 1976. The court, sitting without a jury, heard live testimony on March 24, 1976 at Greenville, South Carolina, at which time the parties agreed to have the record include all discovery depositions taken by both parties and filed with the court prior to trial. On the basis of the testimony and evidence thus presented, the court now publishes the following

## FINDINGS OF FACT

1. The defendant, Mechanical Contractors Association of South Carolina is an organization composed of contractors in the electrical, heating, air conditioning and plumbing trades. Of the 400 licensed mechanical contractors in South Carolina, approximately 306 are members of the Mechanical Contractors Association of South Carolina (hereafter referred to as MCA). Its bylaws list a number of general objectives of the MCA, such as serving mechanical specialty contractors as "an effective agency through which to express their collective voice," fostering harmonious relations between general and mechanical contractors, cultivating a cooperative spirit among members, and promoting ethics, fair competition, and quality service. The only specific objective of the MCA, however, is stated as follows: "To provide a bid procedure to eliminate sharp, unfair, and unethical bid practices."

2. All mechanical contractors (or mechanicals), whether MCA members or not, can be generally categorized as subcontractors who are engaged by so-called general contractors to perform particular portions of the work on a larger project which the general contractor has contracted to complete. General contractors (hereinafter generals) are typically awarded contracts on the basis of competitive bids submitted pursuant to plans and specifications drawn or written for the project involved. The general submitting the lowest bid for the specified work is ordinarily awarded the contract, but the prices which generals quote in their bids depend largely upon the prices which various subcontractors have previously quoted to the general for particular segments of the overall project. Generals therefore solicit bids from the subcontractors in much the same manner as they are required to submit their own bids. The obvious result of this procedure is that MCA members and nonmember mechanicals depend upon competitive bidding to secure a major portion of their business.

3. Individuals and organizations soliciting bids from generals invariably establish a deadline for the submission of bids, and the common practice in the construction industry at one time allowed subcontractors to submit their bid to generals at any time prior to the deadline for submission of general bids. The result was a chaotic situation for the generals, who might be inundated by subcontractors' bids immediately prior to the general filing deadline and thus lack sufficient time to evaluate the subcontract bids adequately prior to submission of the general bid.

4. To combat this apparent problem, the numerous members of the Associated General Contractors of America (hereinafter AGC) devised the so-called "four hour" bid procedure designed "to create a system of receiving prices on subcontracts and materials in sufficient time to allow the general contractor to analyze and evaluate sub-bids and material prices, and his own bid, prior to the general bid filing." Adherence to the four hour procedure by AGC members requires that, in the case of all construction projects designated as "four hour bid jobs" in a weekly AGC bulletin, they refused to receive sub-bids after four hours prior to the time of the general bid filing.[1] It ap-

---

1. There are some variations in the four hour time limitation. For example, if the general

filing deadline is set early in the day, sub-bids may have to be submitted to the general con-

pears that the four hour procedure was instituted by AGC members in North and South Carolina in approximately 1957 and has been in effect continuously since that date.

5. The four hour procedure apparently solved most of the problems which generals encountered in the bidding process, but subcontractors, including mechanicals, were encountering additional difficulties. The chief complaint of the mechanicals (and presumably other subcontractors as well) was that generals were engaged in what is known as "bid peddling," i. e., disclosure of the bids of one or more mechanicals in an effort to pressure others into reducing, prior to the four hour deadline, the bids which they had already submitted or were in the process of submitting.[2]

6. In an attempt to eliminate bid peddling and other related unethical practices, the MCA devised a "five hour bid procedure" which it began to employ in addition to the four hour procedure adopted by the AGC. The five hour procedure was instituted in approximately 1957 and has been in effect continuously since that date. It is described in the MCA Directory as follows:

> Members and associate bidders of the Mechanical Contractors Association register an exact duplicate of the bids they are submitting to the General Contractors with Western Union. This registration must take place at least five hours prior to advertised general bid opening and once registered cannot be changed. The mechanical contractors then have one hour to communicate their bids to the general contractors. One hour after general bid opening, Western Union transmits these bids to the Mechanical Contractors Association State Office for tabulation and disbursement to the bidding mechanical contractors.

General contractors cooperate with the Five Hour Bid Plan by becoming signatories to the Code For Ethical Practice and Procedure For Receiving Sub Bids. They agree not to accept bids from non-members of the Mechanical Contractors Association unless those bids are received prior to the five hour deadline. Over 300 general contractors are participating in the plan. Association members and associate bidders are also signatories of the Code For Ethical Practice.

Since the five hour plan deals with acceptance of sub-bids by general contractors, it obviously would be ineffective unless the general contractors in the state agreed to abide by it. The MCA therefore has caused its five hour bid procedure to be printed in the form of an agreement for execution by the various general contractors in South Carolina under which they "endorse and adopt" a "procedure for receiving bids on contracts from mechanical contractors." It provides in relevant part

> 1. On jobs where the time of General Bid Filing is 1:00 P.M., or later, we as a General Contractor will not accept bids from any Mechanical Contractors, in the above stated classification [those projects designated as five hour bid jobs], unless they are received five hours prior to the time of General Bid Filing, provided, however, in the event the Mechanical Contractors file their bids with a Western Union Office five hours prior to the time of Bid Opening, then and in such event, we as a General Contractor will accept such filing in lieu of the five hour provision above stated, and require the Mechanical Contractors bids be received not later than four hours prior to the time of the General Bid Filing.

tractor on the preceding day. For purposes of this action, however, the "four hour" procedure is applicable with an actual time limit of four hours.

2. The sub-bidding procedure may at times be plagued by other unethical practices such as "bid shopping," in which generals submit their own bids and thereafter "shop" for a mechanical or other subcontractor who will meet a

given price, and "bid piracy" in which a subcontractor will use the valuable information contained in a competitor's already-filed bid as a starting point for the preparation of his own bid. The discussion of unethical practices in the mechanical contracting industry in this action, however, has focused almost entirely upon bid peddling.

In addition to the provisions quoted above, the following material from the by-laws of the MCA appears relevant to the issues raised here:

II. It is not to be construed that this bid procedure is to eliminate or exclude other mechanical contractors bidding in the areas established under the By Laws; to the contrary, such mechanical contractors are invited and urged to utilize such bid procedure; however, it is expected that the By Laws of the Association be complied with.

Plaintiff argues that the effect of the five-hour rule established through the subscription of general contractors to the MCA plan [3] is to require all non-member mechanicals to bid directly to the generals prior to the five hour Western Union filing deadline which applies to MCA members. At this point non-members can presumably have their bids peddled until the five hour deadline for Western Union filings. The MCA by-laws, however, specifically state that non-members may utilize the Western Union filing procedure, although compliance with the MCA by-laws is "expected," and the description of the five hour procedure in the MCA Directory refers to the participation of "members and associate bidders" in filing bids with Western Union. Moreover, the text of the agreement signed by all cooperating generals does not require the signing general to refuse to accept a mechanical's bid for noncompliance with the MCA by-laws; rather it requires the general to refuse any bid filed less than five hours prior to the general filing deadline *unless* the mechanical submitting the bid has filed it with a Western Union office five hours prior to the general deadline. Under these circumstances, and because there is no evidence to support a contrary conclusion, the court is compelled to find as a matter of fact that, regardless of the validity of plaintiff's concern that its bid might be peddled if it were called into the contractor directly prior to the five hour Western Union filing deadline, there is nothing to prevent any non-member of the MCA who wishes to from filing its bid with Western Union prior to the five hour deadline, subsequently calling the bid in to the generals prior to the four hour deadline, and having the bid accepted by the successful general contractor without violation of the general's agreement with the MCA.

7. Plaintiff has also questioned the nature and adequacy of the MCA's criteria and procedures for designating particular construction projects as "five hour bid jobs." An examination of the entire record does reveal that defendant was unable to establish with any degree of specificity exactly what its criteria and procedures were. It does appear to be uncontradicted, however, that the Lander College Library project out of which this suit arose involved approximately $500,000.00 of mechanical work. In addition, the evidence establishes that a job of this magnitude, involving considerable potential profit, would have been designated by the MCA as a five hour bid job as a matter of course since the inception of the five hour rule. Therefore, despite the perhaps nebulous criteria and procedures employed by the MCA in designating five hour bid jobs, the decision to make the Lander College Library project a five hour bid job would normally have been reached by the MCA in accordance with its long-established practice.

8. Once a construction project has been designated as a five hour bid job, it is listed in the MCASC Weekly Bulletin. This bulletin is mailed to all members of the Mechanical Contractors Association of South Carolina and to all general contractors who have signed the agreement to abide by the five hour bid procedure. In addition, the bulletin is mailed to all architects and AGC planning rooms which have jobs listed in the bulletin. The bulletins are posted in the AGC Plan Room for inspection, and it appears undisputed that any mechanical could determine whether a job had been

---

**3.** Approximately 249 general contractors in South Carolina had signed the MCA's five hour bid procedure as of September 1, 1975.

designated a five hour bid job by asking the architect, any general contractor bidding the job, or any member of the MCA. It does not appear, however, that either the MCA or anyone else makes any effort to notify non-members of the status of particular jobs, and non-members are apparently expected to find out this information on their own.

9. As has been previously stated, plaintiff Cullum Electric and Mechanical, Inc., is a mechanical contractor located in Greenwood, South Carolina. Plaintiff was a member of the MCA for approximately two years from November 1967 through November 1969. At the time of the Lander College Library bid, however, plaintiff was not an MCA member.

10. The Lander College Library was scheduled to be constructed during 1975, and bids on the project from general contractors were scheduled to be submitted on March 25, 1975. The job involved approximately $500,000.00 of mechanical work and was designated by the MCA as a five hour bid job. For the three weeks immediately prior to March 25, 1975, the Lander College Library project was listed as a five hour bid job in the MCA Weekly Bulletin, which stated that bids would be submitted to Western Union at 9:00 a. m. and to the general contractors at 10:00 a. m., and that the general opening was at 2:00 p. m. The bulletin listed 14 general contractors bidding on the Lander job, and all but one of these generals had agreed to adhere to the MCA five hour bid procedure.

11. Plaintiff's president testified that plaintiff did not receive a copy of the MCA bulletin, was not notified by any one that the Lander job had been designated a five hour bid job by the MCA, and did not know that the job had been designated as a five hour bid job at the time its bid was submitted. Plaintiff in fact began calling its combined electrical, heating and air conditioning bid in to general contractors around 10:00 a. m. on March 25, 1975. Plaintiff's bid was received by telephone by Triangle Construction Company of Greenville, South Carolina, at 10:05 a. m. on March 25, 1975.

It also appeared that the bid of Mac Reeves Company was called in to Triangle Construction Company at 10:05 a. m., the same time that plaintiff's bid was called in; Mac Reeves Company had filed its bid with Western Union at 9:01 a. m. on March 25, 1975, one minute after the 9:00 a. m. deadline established by the MCA five hour bid procedure. Mac Reeves Company was an MCA member on that date.

12. At approximately 10:30 a. m. on March 25, 1975, the vice president of F & D Electrical Company, a subcontractor and MCA member bidding on the Lander College Library job, was informed by a representative of a general contractor that Cullum Electric was "putting out bids after the deadline." James F. Collier, F & D's Vice President, next obtained information from a relative employed by another general contractor that F & D's bid was the lowest submitted by an MCA member. Collier next called Mrs. Darlene Asbill, a secretary for the MCA, and informed her of what he believed to be Cullum Electric's late bid. Mrs. Asbill was instructed by Joseph Albers, Managing Director of the MCA, to call the general contractors bidding the Lander College Library job and remind them of their signed agreement with the MCA and that using plaintiff's bid would be a violation of that agreement. Plaintiff has correctly pointed out that Mac Reeves Company, an MCA member, failed to comply with the MCA bidding procedure but was not the subject of any similar telephone calls from the MCA office. There is no evidence, however, that the MCA office or any other MCA member was aware of Mac Reeves' noncompliance at the time the calls concerning Cullum Electric were made. Moreover, any action that might have been taken by the MCA at a later time was obviously rendered unnecessary by the fact that Mac Reeves had not submitted the low bid on the Lander College job and would not have been selected by any of the general contractors.

13. Plaintiff's bid of $442,000.00 for combined electrical, heating, and air conditioning work was the low bid received by

the 14 general contractors bidding on the job. The next closest combined electrical, heating, and air conditioning bid was that of Thad Coleman Company of Greenville, South Carolina (heating and air conditioning—$243,571.00) and F & D Electrical Company of Columbia, South Carolina (electrical—$201,365.00). The combined bid of F & D Electrical and Thad Coleman Company was $444,936.00, or $2,936.00 more than Cullum Electric's combined bid of $442,000.00. Triangle Construction Company, the general contractor eventually awarded the Lander College Library job, had previously used Cullum Electric as a subcontractor, and has done so since the Lander College job; Triangle's representatives acknowledged that Cullum Electric was a qualified licensed electrical, heating, and air conditioning contractor and that its bid would have been used by Triangle on the Lander College Library job if it had not been for the MCA telephone call and for Triangle's signed agreement with the MCA.

14. In a continuing effort to secure the Lander College Library job on the basis of its bid, plaintiff contacted Lander College, Triangle Construction Company, and the MCA on various occasions following March 25, 1975. The result of these contacts, which took place prior to the filing of this suit, may be summarized to indicate that Lander College had no objection to the use of plaintiff's bid and that Triangle Construction Company was willing to use plaintiff's bid unless the MCA continued to maintain its position that Triangle's use of Cullum Electric's bid would violate the Triangle–MCA agreement concerning the five hour bid procedure. These subsequent efforts on behalf of the plaintiff appeared to have been made almost entirely in the form of written correspondence, and the contacts between plaintiff and defendant appeared to have been made by the respective attorneys for each party. No formal hearing, evidentiary or otherwise, seems to have been held concerning plaintiff's case, but no

such hearing seems to have been demanded by plaintiff or its attorney. It further appears that both parties were in possession of the full facts concerning the controversy as a result of the correspondence between them. The MCA, however, chose not to alter its position, and shortly after May 1, 1975, Triangle Construction Company awarded the electrical subcontract for the Lander College Library job to F & D Electrical and awarded the heating and air conditioning subcontract to Thad Coleman Company.

15. On the basis of the evidence presented to the court, and in light of the findings of fact already published above, the court is also compelled to find as a fact the following: Although Cullum Electric was not specifically notified by the MCA or anyone else that the Lander College Library project had been designated a five hour bid job by the MCA, the knowledge acquired by plaintiff during its two year tenure as an MCA member, in addition to its subsequent experience in the mechanical subcontracting industry, was more than adequate to provide plaintiff with knowledge of the virtual certainty that the Lander College Library job would in fact be designated by the MCA as a five hour bid job. Plaintiff's failure to submit its bid in compliance with the standards established in the MCA five hour bid procedure therefore cannot be attributed to any failure on the part of the MCA to notify plaintiff that the Lander College Library job had been designated a five hour bid job.

## CONCLUSIONS OF LAW

 Plaintiff's allegations in this action originally constituted an attack on the MCA on two fronts. The complaint alleged both an attempt to monopolize and a conspiracy to monopolize under Section 2 of the Sherman Act,[4] and also an illegal group boycott and illegal price-fixing activity un-

---

4. Section 2 of the Sherman Act, 15 U.S.C. § 2 renders illegal the conduct of "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."

der Section 1 of the Sherman Act.[5] Since the legal arguments and evidence presented by the plaintiff during and after the trial of this action have been directed entirely toward proving a violation of Section 1, it appears that plaintiff has effectively abandoned its efforts to establish any violation of Section 2. The elements necessary to prove an attempt to monopolize as a violation of Section 2 may be generally summarized as: (1) indication of a "dangerous probability" of monopoly by showing that the defendant has sufficient power to create a monopoly and has committed overt acts in furtherance of that goal; (2) establishment of the relevant market; and (3) proof of specific intent to monopolize. To establish the existence of a combination or conspiracy to monopolize in violation of Section 2, a plaintiff must prove the following elements: (1) the existence of a combination or conspiracy; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon a substantial amount of interstate commerce; and (4) the existence of specific intent to monopolize. As indicated previously, it appears that plaintiff has actually abandoned its efforts to establish a violation of Section 2, but the court nevertheless feels compelled to state its conclusion that, as a matter of law, plaintiff has failed to introduce evidence sufficient to prove the necessary elements of either an attempt to monopolize or a combination or conspiracy to monopolize under Section 2 of the Sherman Act.

Plaintiff's allegations of Section 1 violations raise the significant issues in this case, and those allegations are the following:

(1) By restricting the time when a general contractor may receive and negotiate for competitive sub-bids it (the MCA procedure) limits and restrains competition to the end that the owner (in this case the taxpayers of South Carolina) is required to pay a higher price for the construction.

(2) By requiring general contractors to refrain from receiving and using sub-bids not submitted in compliance with the prescribed procedure, the procedure constitutes a combined refusal to deal or an agreement to boycott, the purpose of which is to coerce all subcontractors to comply with the anti-competitive procedures of the association.

(3) By treating members of the association more favorably than non-members, the procedure constitutes unfair and discriminatory trade practices with the natural tendency of depriving non-members of a fair and equal opportunity to compete and to deprive them of their ordinary means of earning a livelihood.

All of these allegations have the effect of charging violations of Section 1 of the Sherman Act, but only the first and second appear to merit the serious consideration of the court at this stage in the litigation. Proof of the third allegation could indeed be a basis for Section 1 liability, but the previously published findings of fact indicate that plaintiff has failed to establish the most significant portion of this charge— that the five-hour bid procedure treats members of the MCA more favorably than non-members.[6]

■ Plaintiff's first allegation is not the one upon which it seems to rely most strongly, but since it, in effect, charges that MCA members and general contractors have engaged in concerted action which resulted in price fixing, this allegation deserves careful scrutiny. There is certainly no doubt that there has been concerted action in this case by MCA members and general contractors; the existence of the written five-hour bid procedure agreements precludes any contrary conclusion. In addition, perhaps the clearest maxim in all anti-

**5.** Section 1 of the Sherman Act, 15 U.S.C. § 1 provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce along the several States, or with foreign nations, is hereby declared to be illegal."

**6.** It is conceivable that the five-hour bid procedure of the MCA could have certain adverse effects upon non-member mechanical contractors in a case factually different from this one. This possible problem, which relates to the MCA's provisions for notice and hearings on complaints, is considered later in this order.

trust law is that any arrangement between two or more competitors which interferes with the setting of prices by free market forces is both unreasonable and per se unlawful. In the leading case of *United States v. Socony-Vacuum Oil Company,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, *rehearing denied* 310 U.S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421 (1940), Mr. Justice Douglas stated on behalf of the Court:

> Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. 310 U.S. at 221, 60 S.Ct. at 843.

In support of its generalized allegations of indirect price tampering, plaintiff relies heavily upon a series of California cases decided under that state's Cartwright Act, which is patterned after the federal Sherman Act. The leading case in this series for our purposes is *Oakland-Alameda County Builders' Exchange v. F. P. Lathrop Construction Company,* 4 Cal.3d 354, 93 Cal. Rptr. 602, 482 P.2d 226 (1971) (en banc), involving the operation by a builders' exchange of a so-called "bid depository" which plaintiff contends is substantially similar to the MCA five-hour bid procedure. In *Oakland-Alameda* the California Supreme Court held that the bidding procedures in question were unenforceable because they constituted per se violations of the Cartwright Act, both as an illegal group boycott and as an unlawful price fixing arrangement. The court's decision, which reversed a 1971 decision of the California Court of Appeal reported in 8 Cal.App.3d 75, 87 Cal. Rptr. 129 (1970), is indicative of the recent tendency of the California courts to disapprove of any bidding procedure which places time restrictions upon subcontractors in the submission of their bids to generals. For example, a procedure similar to the four-hour rule which is in effect but not challenged in this case was held violative of the Cartwright Act in *People v. Inland Bid Depository,* 233 Cal.App.2d 851, 44 Cal.Rptr.

206 (1965). In *Oakland-Alameda* the purpose of the bid depository was found to be identical to the principal purpose of the MCA five-hour rule, *i. e.,* to prevent bid peddling. The court, however, made the following observations about bid peddling:

> Instead of being a vice, however, it is readily apparent that the practice defined as "bid peddling" is illustrative of open price competition in its purest form. To the extent that general contractors disclose the lowest subbids to competing subcontractors and thereby induce the subcontractors to make still lower subbids, the general contractors are able to offer lower prime bids to the awarding authority. The awarding authority, the taxpayers in the case of public projects and consumers in other instances, are the true beneficiaries. To obtain the lowest possible bid is the object of competitive bidding.

After examining the rules of the bid depository, the court then reached the following conclusions:

> Thus, neither general contractors nor interested subcontractors who used the Depository are able to exercise initiative to instigate open price competition among subcontractors and by that means to stimulate lower subbids. . . . In essence, the rules constitute an agreement by subscribing subcontractors not to engage in open price competition in the submission of their bids to general contractors and an agreement by participating general contractors not to deal with subcontractors who do not cooperate.

On this basis, the court concluded that the depository rules were unenforceable because they constituted a per se illegal agreement to fix or tamper with prices.

■ Despite the reasoning of the California Supreme Court, this court is not prepared to assume on the record before it that bid peddling is essential to the purity of open price competition and that any attempt to eliminate it is per se illegal. Moreover, an allegation that time restrictions on bid submission are tantamount to

price fixing (which is what plaintiff seems to claim here) attacks not only the five-hour bid procedure in effect here, but also the entire structure of competitive bidding in the construction industry. A more reasonable approach to such allegations can be found in the opinion of the Court of Appeal in *Oakland-Alameda,* where the court upheld a provision similar to the four-hour rule involved in this case and commented:

> Trade and commerce by definition imply that at some time a bargain will be struck. The system of competitive bidding is well recognized as, and is mandatory in connection with most public contracts as, a method of securing the performance of work at the lowest competitive price. It is obvious that there must be some interval between the time the general contractor receives the ultimate bid from a subcontractor, and the time he computes and makes his bid to the awarding authority. An agreement to make this period uniform for general and subcontractors alike is certainly a restraint on trade, but it cannot be considered an unreasonable restraint on trade without indicting the whole competitive bidding process. 8 Cal.App.3d at 89, 87 Cal.Rptr. at 141.

The essence of the system of competitive bidding for construction contracts and subcontracts is indeed to obtain the lowest possible price for the quality of work desired. When a subcontractor submits a bid to a general, he has presumably calculated and submitted a price which will allow him to complete the job in accordance with the labor and material specifications and at the same time earn a profit which will be fair to the subcontractor and competitive with that sought by other subcontractors bidding the same job. If it is assumed that some or all subcontractors will lower their bids during a period of bid peddling, the only sources from which these reductions can come are the reduction of the subcontractor's profit margin or the reduction of his costs on the project. The former would obviously result in an ultimate savings to the consumer, but the latter would just as inevitably result in a reduction of the quality of the materials or performance supplied by the subcontractor. The court's conclusion in *Oakland-Alameda* notwithstanding, it appears that the bidding procedures under the five-hour and/or four-hour rules are self-regulating and conducive to open price competition. A bidding subcontractor willing to provide quality work and materials for a lower price than his competitors undoubtedly will be awarded the contract by a general contractor with full authority to accept or reject any and all bids. This is the essence of open price competition, and it does not appear to be jeopardized by the bidding procedures now in effect in South Carolina.

There are also numerous other price-related factors which could be affected by the presence or absence of a regulated bidding procedure. For example, the Court of Appeal in *Oakland-Alameda* made the following observations:

> From all that appears from the pleadings in this case it may be shown that subcontractors are dissuaded from bidding until the last possible interval of time in the absence of the orderly system provided by a bid depository; that bids are purposely high to compensate for bid shopping or bid peddling; and that the number of subcontractors bidding on any particular job is reduced in the absence of conditions enhancing the fair competition.

■ The record before the court in this case is devoid of any indication that the five-hour bid procedure was devised by the MCA with any intention whatsoever of fixing prices. More significantly, however, the record also fails to reflect that the five-hour bid procedure has had any effect whatsoever upon prices, whether to raise, lower or stabilize them. Plaintiff has simply failed to establish that general contractors are paying the same amount, or a greater or lesser amount for mechanical work than they would pay under a system not regulated to eliminate such practices as bid peddling. In this regard, the observation of the Supreme Court in *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) is of some signifi-

cance. Despite its previous disapproval of horizontal territorial restrictions in *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), the Court concluded in *White Motor Co.,* when reviewing the granting of a summary judgment, that:

> This is the first case involving a territorial restriction in a vertical arrangement; and *we know too little of the actual impact* of both that restriction and the one respecting customers *to reach a conclusion on the bare bones of the documentary evidence before us.* 372 U.S. at 261, 83 S.Ct. at 701 (emphasis added).

Despite the existence of a full record in this case, it is similarly unwise and impossible to reach a conclusion of illegality. This court knows too little because plaintiff has proved too little concerning the impact of the five-hour bid procedure on prices for mechanical construction work. It is therefore the conclusion of the court that plaintiff has failed to prove a violation, a per se or otherwise, of Section 1 of the Sherman Act based upon any action of defendant to fix prices in the mechanical subcontracting field.

Plaintiff's remaining allegation is that the five-hour bid procedure is illegal per se under Section 1 of the Sherman Act because it constitutes a group boycott. It must be conceded that the United States Supreme Court has, in a number of cases, held that a particular boycott was a per se violation of Section 1 of the Sherman Act. *See, e. g., United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Northern Pacific Ry. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Fashion Originators' Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Eastern States*

*Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). In light of these decisions, it is quite understandable that many courts and commentators have contended and do contend that all group boycotts are per se violations of Section 1.

Despite the pronouncements of the Supreme Court, a multitude of lower courts have continued to evaluate alleged boycotts under a "rule of reason" analysis rather than by the per se doctrine employed by the Supreme Court in the aforementioned cases. As one commentator has observed, "the law in Washington, however, is quite different from the law in the rest of the country." Woolley, *Is a Boycott a Per Se Violation of the Antitrust Laws? 27 Rutgers L.Rev.* 773 (1974). The article cited above catalogs and discusses a large collection of lower court decisions which employ various theories to qualify the per se rule; these cases, however, involve many factual situations which might arguably appear to fall well within the category of boycotts which the Supreme Court would consider per se illegal. This apparent dichotomy between the Supreme Court and lower court views of the law applicable to group boycotts has prompted many other articles as well. *E. g.,* Barber, *Refusals to Deal Under the Federal Antitrust Laws,* 103 *U.Pa.L.Rev.* 847 (1955); Byrd, *Sherman Act Limitations on Non Commercials Concerted Refusals to Deal,* 1970 *Duke L.J.* 247; Note, 48 *Temple L.Q.* 126 (1974); Case Note, 27 *Ark.L.Rev.* 722 (1973); Comment, 13 *B.C.Ind.Comm.L.Rev.* 484 (1972); Note, 66 *Colum.L.Rev.* 1486 (1966); Note, 71 *Harv.L.Rev.* 1531 (1958). These sources contain numerous citations to decisions in which lower courts, in one way or another, have declined to adhere to the application of a per se rule of illegality in cases involving allegations of group boycotts. Reported decisions also indicate that this trend has continued since the publication of the most recent of the articles cited above. While a discussion of all of these decisions might not prove to be a totally impossible undertaking, it would certainly be fruitless to attempt to reconcile the vari-

ous approaches taken therein. To state that the law concerning group boycotts and Section 1 of the Sherman Act lacks consistency would be to understate the truth by a wide margin.

■ Plaintiff urges that the MCA five-hour bid procedure to which many general contractors have agreed constitutes an illegal group boycott because it either places non-members of the MCA at a severe competitive disadvantage or excludes them from the bidding process altogether. This position is untenable, however, because the court has previously found as a fact that non-members of the MCA appear to have as great an opportunity as members to file their bids with Western Union and participate in the bidding process without violating the five-hour rule. Plaintiff's alternative contention seems to be that, regardless of the existence of any distinctions between members of the MCA and non-members, Cullum Electric was still the victim of illegal concerted action constituting a group boycott. Under either of plaintiff's theories, the type of boycott alleged must be regarded as secondary, in the sense that one group (the MCA) has allegedly exerted some sort of persuasive force upon another group (general contractors) in order to produce an ultimate effect upon certain other parties (e. g., Cullum Electric). Defendant has repeatedly contended that it has no means of exerting economic leverage against the general contractors in order to compel them to adhere to its five-hour bid procedure; it further contends that it has absolutely no means of enforcing the general's promise other than to appeal to the sense of moral obligation which sometimes arises out of so-called gentlemen's agreements. Nevertheless, the absence of such coercion, economic or otherwise, does not appear to be a valid defense to a charge of group boycotting. This issue appears to have been settled at least since the decision of the United States Supreme Court in *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), where the Court held that "a restraint produced by peaceable persuasion is as much within the prohibition (of the Sherman Act) as one accomplished by force or threats of force."

Both parties seem to have structured their arguments around the presumption that some form of boycott is indeed present and that the critical issue of law in the case is whether this court will adhere to a rule of per se illegality for group boycotts or apply a "rule of reason" analysis to the conduct in question here. As indicated by the numerous cases and articles referred to above, the court would not suffer for lack of reference material in the decision of this issue. There is actually little, if any, middle ground between a per se rule of illegality for group boycotts and the application of a rule of reason analysis. Many courts have nevertheless attempted to manufacture a workable compromise, but their efforts have not met with any notable degree of success. The application of a per se rule in any area of judicial decision necessarily results in the proscription of a broad range of possible activity. Within this range, some activity can easily be labeled as totally reprehensible. Other activity, however, will lie at the other end of the spectrum, and the decision to brand it as automatically illegal may be open to serious question. Defendant understandably urges that the action in question here should not fall under the blanket of per se illegality, and that this is an appropriate case for the application of a rule of reason. It is apparent that the Supreme Court has not yet considered a case marked by the facts present here, and while the Court might consider this case appropriate for the application of a rule of reason if it were making the decision, it is extremely difficult for a court at this level to challenge pronouncements of per se illegality as strong and as clear as some of those which have appeared in existing decisions of the Supreme Court. Defendant, however, continues to urge rather convincingly that its conduct has in fact been "reasonable," and correctly points out that the use of the five-hour bid procedure involves a minimal risk of economic harm to mechanical contractors.

■ Despite the parties' view of the principal issue involved in this case, the court must conclude that its decision should

not be based upon a choice between the rule of reason and the doctrine of per se illegality. There is an inherent risk of criticism in deciding any case without reaching an admittedly complex legal issue which both parties have fully argued, briefed, and assumed to be critical to their success in the case. Nevertheless, the factual situation in this case is such that the court cannot reach the initial conclusion that a group boycott exists or has existed as a result of the MCA's five-hour bid procedure. The absence of a group boycott of course prevents defendant's conduct from being held per se illegal and indeed renders it not illegal at all, even assuming *arguendo* that the Supreme Court has pronounced the per se illegality of all group boycotts.

Most alleged boycotts fall so clearly within the meaning of that term that courts are seldom either disposed or required to define it. Reference to the dictionary reveals the following definition of "boycott":

> A conspiracy or confederation to prevent the carrying on of business, or to injure the business of anyone by preventing potential customers from doing business with him or employing the representatives of said business, by threats, intimidation, coercion, etc. *Black's Law Dictionary.*

The Supreme Court's significant opinion in *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), provides some insight in its statement that:

> There can be no doubt that the effect of the combination or conspiracy here was to restrain trade and commerce within the meaning of the Sherman Act. Elimination, by joint collaborative action, of discounters from access to the market is a per se violation of the Act. 384 U.S. at 145, 86 S.Ct. at 1330.

It seems fair to infer from this language that the Court considers to be a group boycott any joint action which actually or effectively eliminates any competitor from access to the market. Perhaps the fairest and most complete definition of a group boycott is found in Barber, *Refusals to Deal Under the Federal Antitrust Laws,* 103 U.Pa.L.Rev. 847 (1955), a significant article cited above and also cited by the Court in *General Motors.* Barber defines a group boycott in the following fashion:

> The distinguishing feature of the group boycott cases is group action to coerce third parties to conform to the pattern of conduct desired by the group or to secure their removal from competition. . . .
> Such action offends the concept of a free market because it places involuntary restraints on the trading opportunities of strangers to the group.

Under any of these definitions, the existence of a group boycott simply cannot be established upon the facts presented concerning the MCA five-hour bid procedure. There is no contention that there is any restriction whatsoever upon membership in the MCA, but even so, non-members are just as free to use the Western Union filing procedures as MCA members are. There is no boycott inherent in the rules because all mechanical contractors regardless of MCA affiliation are free to compete in the bidding process under identical regulations. Plaintiff would have the court construe the generals' agreement with the MCA as an agreement to boycott non-members, but that is simply not what the pact is. It is not an exercise in legal hair-splitting to interpret the agreement according to the language it contains, and that language says that the signing generals will adhere to a policy of accepting only certain types of bids, *i. e.,* those that are on time under the five-hour rule. All mechanical contractors, members and non-members alike, are subject to the rule and none are foreclosed from access to the market unless they elect not to comply with the time limitation. Failure to comply with the five-hour rule creates a result identical to that produced by a mechanical's violation of the general contractors' four-hour rule—that mechanical's bid will not be accepted.

The element of coercion "to conform to the pattern of conduct desired by the group" must also be considered in this case, but it is the nature of the "desired" conduct here which seems most significant. The five-hour bid procedure requires all mechanical contractors, without exception, to submit bids according to the same time

limitation. Regardless of the source of this limitation, it appears little more restrictive than any of a number of other administrative requirements which the general contractors might establish for themselves, such as submission of bids in typewritten form, placing of all bids on 8½ by 11 inch paper, presentation of a specified number of extra copies of each bid, or even mailing or otherwise communicating the substance of each bid to a particular location and no other. Perhaps the legal guidelines are and may always be hazy, but there is a distinction between conduct which constitutes a boycott and conduct which does not. The Supreme Court may have alluded to this distinction in *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), where a per se illegal group boycott was found when the New York Stock Exchange directed certain of its member firms to discontinue private wire connections with two non-member over-the-counter securities broker-dealers, without assigning any reason therefor or giving the non-members notice or an opportunity to be heard. The Court stated:

> The concerted action of the Exchange and its members here was, in simple terms, a group boycott depriving petitioners of a valuable business service which they needed in order to compete effectively as broker-dealers in the over-the-counter securities market. . . . Without membership in the network of simultaneous communication, the over-the-counter dealer loses a significant volume of trading with other members of the network which would come to him as a result of his easy accessibility. These important business advantages were taken away from petitioners by the group action of the Exchange and its members. Such "concerted refusals by traders to deal with other traders . . . have long been held to be in the forbidden category," *Klor's, Inc. v. Broadway-Hale Stores, Inc.* (359 U.S. at 212, 79 S.Ct. at 709), of restraints which "because of their inherent nature or effect . . . injuriously restrain trade," *United States v. American Tobacco Company*, 221 U.S. 106, 179, 31 S.Ct. 632, 55 L.Ed. 663, 694.

In this case, the five-hour rule itself has not deprived plaintiff of an important or even an unimportant business advantage. Plaintiff might complain about having to submit its bids five hours ahead of the general deadline rather than four, but MCA members are subject to the same rule and have standing to raise the same complaints about the procedure. Plaintiff has cited cases involving bidding restrictions which were held to constitute illegal boycotts but without exception, those decisions involve bid depositories or other procedures, such as that present in *Oakland-Alameda, supra,* which are far more restrictive and exclusive than the system in this case. The conduct of which plaintiff complains, the institution of the five-hour bid procedure at the request of the MCA, simply does not constitute a group boycott, violative of Section 1 of the Sherman Act or of any other statute, and this court so concludes as a matter of law.

A most significant issue in this case thus becomes plaintiff's alleged lack of knowledge that the Lander College Library job had been designated a five-hour bid job by the MCA. The court has already found as a fact, however, that plaintiff knew or should have known that the Lander College Library job had been so designated. Were this not the case, the court would consider with the greatest care plaintiff's allegations that the five-hour bid procedure violates Section 1 because the MCA makes either insufficient efforts, or no efforts at all, to notify non-member mechanical contractors of the designation of certain construction projects as five-hour bid jobs. In this regard also, there appears to be possible merit in plaintiff's allegations that the MCA's lack of a hearing procedure for disputes involving non-members jeopardizes the legality of the five-hour rule. Plaintiff has cited such cases as *Silver, supra,* and *Blalock v. Ladies Professional Golf Association*, 359 F.Supp. 1260 (N.D.Ga.1973) as illustrative decisions in these areas of the law, and the court has reviewed them with interest. Nevertheless, the court also has previously found in this case that the communications between plaintiff and the MCA concerning their dispute adequately informed each par-

ty of the other's position, and that plaintiff did not request a hearing of a more formal nature than the communications which actually occurred. Therefore, although a different result might be required in the case of a plaintiff without plaintiff's knowledge of MCA procedure, the court concludes as a matter of law that this plaintiff, Cullum Electric, has failed to establish the validity of any cause of action based upon defects in the notice and hearing procedures employed by the MCA in connection with the five-hour bid rule.

## CONCLUSION

Since plaintiff has failed to establish that it is entitled to recover on any of the causes of action advanced in its complaint, the Clerk of this Court is directed to enter judgment in favor of the defendant in this action, and plaintiff shall take nothing.

AND IT IS SO ORDERED.